**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Reies Lopez TIJERINA, Cristobal Lopez Tijerina, Jerry Noll, Ezekial Dominguez and Alfonso Chavez, Defendants-Appellants.**

**Nos. 10031–10035.**

United States Court of Appeals
Tenth Circuit.

Feb. 14, 1969.

Rehearings Denied April 10, 1969.

John Quinn, U. S. Atty. (John A. Babington, Asst. U. S. Atty., on the brief), for plaintiff-appellee.

Morton Stavis, Newark, N. J. (Beverly Axelrod, San Francisco, Cal., Albert Gonzales, Santa Fe, N. M., Arthur Kinoy, William M. Kunstler, New York City, of counsel, on the brief), for defendants-appellants Reies Lopez Tijerina, Cristobal Lopez Tijerina and Jerry Noll.

Joseph H. Mercer, Albuquerque, N. M., for defendant-appellant, Ezekial Dominguez.

Robert C. Poole, Albuquerque, N. M., for defendant-appellant, Alfonso Chavez.

Before MARVIN JONES *, Judge, Court of Claims, and BREITENSTEIN and HICKEY, Circuit Judges.

BREITENSTEIN, Circuit Judge.

The defendants-appellants were jointly charged in a five-count indictment and all were found guilty by a jury on one or more counts. The appeals are from the judgments imposing sentence.

The first count charged an assault on forest ranger Taylor, an official of the Forest Service, Department of Agriculture, in violation of 18 U.S.C. §§ 111 and 2. The second count charged a similar assault on forest ranger Smith. The third count charged the conversion of a 1962 Dodge truck, the property of the United States, in violation of 18 U.S.C. §§ 641 and 2. The fourth count charged a similar conversion of a 1965 Dodge truck. The fifth count charged conspiracy.

Reies Tijerina was found guilty of the two assault counts. Cristobal Tijerina was found guilty of the first count charging an assault on ranger Taylor.[1] Dominguez was found guilty on the second count charging an assault on the ranger Smith. Noll and Chavez were convicted on the two assault and the two conversion counts. On the conspiracy count the jury disagreed and the court ordered a mistrial.[2]

The charges grew out of a demonstration on October 22, 1966, at the Echo Amphitheatre Camp Ground in the Carson National Forest, Rio Arriba County, New Mexico. The demonstration was arranged by an organization known as Alianza Federal de Mercedes to publicize the grievances and claims of a group of Spanish Americans. Reies was the leader and spokesman of Alianza. The complaints of Alianza were twofold. The first was based on the assertion that many Spanish Americans were wrongfully deprived of rights to Spanish and Mexican land grants guaranteed by the Treaty of Guadalupe Hidalgo.[3] The second was based on the denial or limitation of grazing permits issued by the federal government.

The events with which we are concerned began with an Alianza news release signed by Reies and stating that on October 15 a caravan would take over the Pueblo San Joaquin del Rio de Chama. The place for this action was

* Sitting by designation.

1. Hereinafter Reies Tijerina will be referred to as Reies and Cristobal Tijerina as Cristobal.

2. The court imposed the following sentences: Reies, two years on Count One with parole eligibility to be determined under 18 U.S.C. § 4208(a) (2), five years probation on Count Two; Cristobal, two years on condition that he be confined six months in a jail-type institution, suspension of remainder of sentence, and five years probation; Noll, three years each on Counts Two, Three, and Four with the sentences to run concurrently, and five years probation on Count One; Dominguez, two years on Count Two on condition that he be confined in a jail-type institution for 60 days, suspension of remainder of sentence, and five years probation; and Chavez two years each on Counts One, Two, Three, and Four to run concurrently, on condi-
tion that he be confined 60 days in a jail-type institution, suspension of remainder of sentence, and five years probation.

3. 9 Stat. 922. This 1848 treaty ended the war between the United States and Mexico and ceded certain territory to the United States. The treaty provided, 9 Stat. 929, that property rights of Mexicans in the ceded area "shall be inviolably respected." Before the treaty, large areas in what is now the southwestern part of the United States had been granted to individuals by Spain, and later by Mexico. Congress established procedures for the ascertainment of rights to such grants and their confirmation by Congress. A confirmatory act of Congress is final as to the nature and validity of a grant and is not subject to judicial review. See Sanchez v. Taylor, 10 Cir., 377 F.2d 733, 736–737, and cases there cited.

to be the Echo Amphitheatre Camp Ground (Echo) which is located in the National Forest and several miles removed from the San Joaquin del Rio de Chama Grant.[4] On October 15, a group assembled at Echo but no government officials or reporters were present.

On October 19, Reies and a group of his followers went to the office of the regional forester in Albuquerque. A professional process server attempted to serve on the regional forester a notice signed by Reies saying that the heirs of the grants "shall exercise all of their rights and authorities whatever they might be within their respective jurisdictions forthwith" and that the repeated violations of international law by the United States "must cease once and for all time." The regional forester refused to accept the notice and gave Reies a letter saying that in the use of a National Forest camp ground there must be compliance with the applicable rules and regulations "including the possessing of a Land and Water Conservation Fund entrance card."[5]

On October 22, a caravan of cars carrying about 300 people approached the Echo entrance. Rangers Taylor and Smith, who were unarmed, attempted to stop the cars and collect the entrance fee. For their own safety they were required to jump away. They were able to collect no entrance fees. An angry and threatening crowd gathered inside the camp ground. Amidst shouts of "Matelo" and "Cuelgenlo,"[6] rangers Taylor and Smith were seized by defendants Cristobal, Dominguez and Chavez and physically forced to a table at which Noll was sitting. Noll, acting as a judge, told the rangers that they were charged with trespassing and being a nuisance.[7] During these proceedings, Reies was standing on the table to which the rangers were brought. His actions were such that it is a reasonable inference that he was in charge of the proceedings.

After the rangers were permitted to leave the table, they started to take down license numbers. They were seized again and were told by Reies that they would be arrested again if they did not leave. The rangers were then permitted to take personal belongings from their trucks but were not allowed to take the trucks. Noll and Chavez told them that the trucks were impounded. On the departure of the rangers, armed guards, wearing badges, were stationed at the entrance to Echo. Later a captain of the New Mexico state police told the forest supervisor that he could get the trucks but the supervisor declined to do so because of fear of the angry and unruly crowd. Reies had told the captain that they did not want the trucks and that the trucks should not have been impounded. The record is unclear as to when the trucks were recovered but it was sometime after the departure of the crowd.

Photographers and reporters were present to observe what occurred at Echo. Reies, testifying in his own behalf, said that when standing on the table:

"I was observing everything that was going to the news media, the TV and the newspaper; that was my interest, what would go out. * * * my interest was what was going out, what the world would know, or the state."

4. Reies testified that Echo was selected because "it was a public place, and it was in good position, where tourists would go by, and easy for reporters to approach."

5. See 16 U.S.C. §§ 460l–4 to 460l–11 and Executive Order No. 11200, 30 Fed.Reg. 2645. See also 16 U.S.C. § 528. The daily fee for the Echo site was $1.00 per car.

6. The quotes are from the testimony of defendant Chavez. He said that they meant "kill him" and "hang him."

7. Noll was acting as a judge on the pretense that he had been elected to that position by the residents of the Pueblo San Joaquin del Rio de Chama.

Both still and moving pictures were taken and one reel of moving pictures was accompanied by a sound track. Some of the pictures were introduced in evidence. They show a noisy, unruly, threatening mob in a high state of emotional excitement. They display the rough manhandling of the rangers and the force used to take them before Noll.[8]

A five-count indictment was returned against the defendants on March 16, 1967. At that time the United States District Court for the District of New Mexico was using the key-man system to secure names for the jury wheel. Because of attacks made against the system, the court changed to random selection from voting lists. After the change, a new indictment containing identical charges was returned by a grand jury chosen under the new method for placing names in the wheel. At the trial Reies, Cristobal and Noll were represented by retained counsel and Dominguez and Chavez by appointed counsel.

The defendants say that Counts One and Two of the indictment are insufficient because they fail to set forth all of the elements of the offense charged.[9] Section 111, Title 18 U.S.C., provides for the punishment of a person who "forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in or on account of the performance of his official duties." Section 1114, Title 18 U.S.C., covers "any officer or employee of the Department of Agriculture * * * designated by the Secretary of Agriculture * * * to enforce any Act of Congress for the protection, preservation, or restoration of game and other wild birds and animals."

■■ The argument of the defendants is that the indictment should allege that the rangers had been designated by the Secretary to enforce acts of Congress for the protection of game and wild birds and, at the time of the assault, were acting pursuant to such acts. We believe that the indictment is sufficient. As required by Rule 7(c), F.R.Crim.P., it is "a plain, concise and definite written statement of the essential facts constituting the offense charged." It is specific as to time, place, and identity of person assaulted. It charges that the person assaulted was known to be an officer and was engaged in the performance of his official duties. This covers the elements of the offense and apprises the accused "of the nature of the offense so that he may adequately prepare a defense."[10] No more is required.

In response to an appropriate motion, the government filed a Bill of Particulars stating that the official duties of the rangers were the protection, improvement and administration of the National Forest pursuant to the Land and Water Conservation Act of 1965, 16 U.S.C. §§ 460l–4 to 460l–11, 78 Stat. 897, and the Multiple-Use Sustained-Yield Act, 16 U.S.C. §§ 528–531, 74 Stat. 215, and that the duties to be performed were under regulations promulgated pursuant to those acts. Although in our opinion no bill of particulars was needed to save the indictment, the bill contained the information necessary to enable the defendants to prepare for

---

8. At the trial the rangers identified from the pictures the activities of the individual defendants.

9. Count One reads: "On or about the 22nd day of October, 1966, at Echo Amphitheatre Camp Ground, Carson National Forest, Rio Arriba County, in the State and District of New Mexico, the defendants, * * * wilfully did forcibly assault, resist, oppose, impede, intimidate, and interfere with Walter Taylor, an officer of the Forest Service, United States Department of Agriculture, knowing him to be such officer, while the said Walter Taylor was engaged in the performance of his official duties. In violation of 18 USC 111 and 18 USC 2." The second count differed only in the reference to Smith rather than Taylor.

10. Clay v. United States, 10 Cir., 326 F. 2d 196, 198, cert. denied 377 U.S. 1000, 84 S.Ct. 1930, 12 L.Ed.2d 1050.

trial. Indeed, nothing argued by the defendants persuades us that the indictment had any defect affecting their substantial rights.[11]

■■ Intermixed with the attack on the indictment are defense arguments that the forest rangers were not within the coverage of § 111. That section refers to the persons mentioned in § 1114. The latter section includes officers and employees of the Department of Agriculture "designated" by the Secretary to enforce an act of Congress for the protection and preservation of game, wild birds and animals. On August 20, 1940, by virtue of the authority given by 54 Stat. 391, a predecessor of what is now § 1114, the Secretary of Agriculture designated all officers and employees of the Forest Service assigned to field duty "to enforce Acts of Congress, and regulations promulgated pursuant thereto, for the protection, preservation, or restoration of game and other wild birds and animals on lands under the jurisdiction of the Forest Service." This designation was published in the Federal Register on August 22, 1940, and has never been revoked.[12]

■■ Defendants say that the Secretary had no power to make the designation because in 1939 under Reorganization Plan No. II the Bureau of Biological Survey had been transferred from the Agriculture to the Interior Department. The answer is that the predecessor of § 1114 was reenacted after the shift and the Secretary acted under the new law. The rangers, as officers assigned to field duty, were within the designation by the Secretary and the coverage of § 1114. For the protection of the National Forest and the preservation of wild life therein and under the direction of their superiors they acted officially to enforce the Land and Water Conservation Fund Act of 1965, 16 U.S.C. §§ 460*l*-4 to 460*l*-11, the Multiple-Use Sustained-Yield Act of 1960, 16 U.S.C. §§ 528-531, and the regulations thereunder.[13] Among their duties was the collection of the entrance fee at Echo.

Defendants object to the fact that the trial was held in Las Cruces. New Mexico constitutes one judicial district which is not separated into divisions. Las Cruces is designated as a place where court shall be held.[14] The court and the parties were concerned with pretrial publicity and the impanelling of an impartial jury. The defendants were arraigned on September 29, 1967. On October 5, 1967, the court fixed Las Cruces as the place of trial.[15] On October 20, the defendants filed a motion for the transfer of the proceedings to another district and suggested New York, Chicago, or San Francisco. The court denied the motion saying that it was not timely under Rule 22, F.R.Crim. P., and "otherwise not well taken."

■■ The trial was held in the state and district where the offenses were

---

11. See Rule 52(a), F.R.Crim.P., and Russell v. United States, 369 U.S. 749, 763, 82 S.Ct. 1038, 8 L.Ed.2d 240.

12. See 5 Fed.Reg. 2940. The claim of the defendants that the failure to publish the designation in the Code of Federal Regulations makes the designation unenforceable is of no import. The statute, 44 U.S.C. § 307, makes publication in the Federal Register the basis of the presumption of validity, constructive notice, and judicial notice.

13. The government introduced exhibits describing the scope of the duties and responsibilities of the rangers. At the time of the Echo events the rangers were each acting within that scope.

14. 28 U.S.C. § 111.

15. In so doing the court said: "It is the judgment of the Court that it would be in the interest of a fair trial for the case to be tried at Las Cruces. In recent months there have been matters reported involving some of the defendants which have been of wide public interest, very particularly so in the area of Albuquerque and the northern portion of the state. At various hearings, some of the counsel have expressed concern as to the possibility of a fair trial due to the extent of public interest."

committed.[16] Nothing shows that the defendants were prejudiced by a trial in Las Cruces. They are in no position to complain about the convenience of witnesses when they suggested a transfer to distant, out-of-state points. We believe that the court acted with commendable care and caution in assuring a fair and impartial trial.

All of the defendants attack the sufficiency of the evidence. The evidence shows the physical force exerted on Taylor by Cristobal and Chavez and on Smith by Dominguez and Chavez. The rangers were assaulted, resisted, intimidated, and prevented from performing their official duties. Reies and Noll were the ringleaders of the mob. Reies, the acknowledged leader of Alianza, was in command of the mob and at the very least supported and countenanced the actions which resulted in the seizure of the rangers. Noll was the pretended judge who affirmatively exercised control over the rangers after they had been forcibly brought before him. Reies and Noll were aiders and abettors who are guilty as principals under 18 U.S.C. § 2. The claim that the defendants were trying to protect the rangers from the threatening mob was submitted to the jury under proper instructions and resolved against the defendants.

Noll ordered the impounding of the trucks and Chavez carried out Noll's order by preventing the rangers from taking the federally owned trucks. By their acts they deprived the rangers of the power to exercise control over the trucks and acquired that power for themselves and the group of demonstrators.[17] The record discloses a wrongful interference with government property and a conversion within the meaning of 18 U.S.C. § 641.[18]

The defendants say that the instruction on specific intent was erroneous because it shifted the burden of proof on the issue of intent. The pertinent portion of the instructions reads:

"Generally, it is reasonable to infer that a person ordinarily intends all the natural and probable consequences of acts knowingly done. So, unless the evidence in the case leads you to a different or contrary conclusion, you may draw the inference and find that the defendant intended all of the natural and probable consequences which one, standing in like circumstances and possessing like knowledge, should reasonably have expected to result from any act proven to your satisfaction to have been done—knowingly done by him."

The instruction is substantially the same as that appearing in Mathes, Jury Instructions and Forms for Federal Criminal Cases, 27 F.R.D. 39, 78. This instruction has been criticized.[19] In the case at bar no objection was made to the instruction and our problem is whether under Rule 52(b), F.R.Crim.P., there is plain error which affects substantial rights and requires reversal. We think not. On the whole the instructions on intent were adequate. The court instructed that the burden was on the government to prove the intent of each defendant individually. The proof of guilt is clear and convincing. The instructions fully satisfy the requirements of Morrissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288, relative to intent in conversion cases. In comparable circumstances, other circuits

16. See U.S.Const. Art. III, Section 2, and Rule 18, F.R.Crim.P.

17. See United States v. De Normand, 2 Cir., 149 F.2d 622, 624, cert. denied 326 U.S. 756, 66 S.Ct. 89, 90 L.Ed. 454.

18. See Morissette v. United States, 342 U.S. 246, 271–272, 72 S.Ct. 240, 254, 96 L.Ed. 288, where it is said that "[c]onversion, however, may be consummated without any intent to keep" and that

"[k]nowing conversion adds significantly to the range of protection of government property without interpreting it to punish unwitting conversion."

19. See Mann v. United States, 5 Cir., 319 F.2d 404, 407, 410, cert. denied 375 U.S. 986, 84 S.Ct. 520, 11 L.Ed.2d 474; Imholte v. United States, 8 Cir., 226 F.2d 585, 591; and United States v. Barash, 2 Cir., 365 F.2d 395, 402–403.

have held that the giving of the questioned instruction was not reversible error.[20] We agree.

Other attacks on the instructions deserve little consideration. The instruction relating to the good character evidence was in accord with our decisions in Oertle v. United States, 10 Cir., 370 F.2d 719, 726–727, and in Swingle v. United States, 10 Cir., 389 F.2d 220, 222. The defense of good character was merely incidental to the prime defense of no criminal intent. The instructions on the assault counts fully presented the elements of the crime which have been discussed previously in connection with the indictment. The instructions on conversion are consistent with the treatment of conversion in Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288. Taken as a whole, the instructions fairly and adequately presented the issues to the jury.

■ Defendants urge that a pamphlet, Exhibit 32,[21] was irrelevant and improperly received in evidence. No prejudice resulted. The pamphlet was confirmatory of the comprehensive background evidence of the defendants, which the court permitted, and repetitive of the extensive testimony of Reies relating to the objectives of Alianza.

Other points are argued in the prolix briefs. Some of them border on frivolity and none of them require any discussion. These defendants sought publicity through a public demonstration and a confrontation with federal officials. They got all three. In accomplishing those objectives they violated federal laws and must suffer the consequences.

The judgments are severally affirmed.

20. See United States v. Wilkins, 4 Cir., 385 F.2d 465, 473–474, cert. denied 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1144; Helms v. United States, 5 Cir., 340 F.2d 15, 18–19, cert. denied 382 U.S. 814, 86 S.Ct. 33, 15 L.Ed.2d 62; United States v. Releford, 6 Cir., 352 F.2d 36, 40, cert. denied 382 U.S. 984, 86 S.Ct. 562, 15 L.Ed.2d 473; Moore v. United States, 8 Cir., 375 F.2d 877, 880–882,

cert. denied 389 U.S. 844, 88 S.Ct. 92, 19 L.Ed.2d 110; and Sherwin v. United States, 9 Cir., 320 F.2d 137, 148–150, cert. denied 375 U.S. 964, 84 S.Ct. 481, 11 L.Ed.2d 420.

21. The pamphlet was entitled "The Spanish Land Grant Question Examined by The Alianza Federal de Mercedes."