**Oliver Wendell HENDERSON and Leon Edward Jurras, Appellants,**

**v.**

**UNITED STATES of America, Appellee.**

**No. 25951.**

United States Court of Appeals, Fifth Circuit.

April 21, 1970.

William P. Fonville, Dallas, Tex., for Jurras.

George C. Dunlap, (Ct. Appt.), Dallas, Tex., for Henderson.

Eldon B. Mahon, U. S. Atty., Dallas, Tex., Patrick H. Mulloy, Jr., B. H. Tim-

mins, Jr., William F. Sanderson, Jr., Asst. U. S. Attys., Dallas, Tex., for appellee.

Before RIVES, GOLDBERG and GODBOLD, Circuit Judges.

RIVES, Circuit Judge.

Appellants Henderson and Jurras, a third individual defendant Derrick, and a defendant corporation, Leon E. Jurras Associates, Inc., were tried on an indictment containing four counts charging wire fraud (18 U.S.C. § 1343), two counts charging mail fraud (18 U.S.C. § 1341), and a seventh count charging the individual defendants with a conspiracy to commit the substantive offenses charged in the first six counts (18 U.S.C. § 371). All counts alleged the identical scheme and artifice to defraud, which will be described later. Appellants were convicted on Counts 1, 3, 4, 5, 6 and 7,[1] and sentenced to four years imprisonment on each of Counts 1, 3, 4, 5, and 6, to run concurrently, and to four years imprisonment on Count 7, to run consecutively with the sentences imposed on Counts 1, 3, 4, 5 and 6—a total of eight years imprisonment.

Appellants raise three contentions of error, which will be discussed in the following order: (1) That the evidence was insufficient to sustain the conviction on any count; (2) that the evidence was insufficient to establish the offense of mail fraud charged in Counts 3 and 6 of the indictment, in that the mail delivery alleged to be the offense in each Count was not in furtherance of the scheme alleged in the indictment; and (3) that the district court erred in instructing the jury.

### Sufficiency of Evidence

The scheme to defraud alleged in the indictment was that appellants would obtain money as loans from contractors by means of false and fraudulent representations. These false representations, which were alleged in each count of the indictment, were:

1. That appellants had a large contract from the Philippine Government under a Land Reform Program for the construction of physical improvements in the Philippine Islands including concrete highways, water wells, dams, canals, earth work, and houses, and had authority from the Government of the Philippines to grant valid construction contracts for such construction;

2. That appellants had a reasonable expectation of obtaining a contract for the construction of such improvements and a reasonable expectation of having authority to grant valid construction contracts for portions of such construction;

3. That Abraham Axelrod and A. F. Axelrod Company, Inc. of New York City were associated with the defendants in a Land Reform Program of the Philippine Government and that Axelrod had a personal net worth of approximately $45,000,000;

4. That by virtue of the activities of the defendant Jurras, Abraham Axelrod had arranged for the sale of Philippine Government bonds guaranteed by the Bank of the Republic of the Philippines in sufficient amounts to finance a Government Land Program having a total cost of $600,000,000;

5. That the First National Bank of Boston had agreed to act as transfer agent for the Philippine Government bonds issued to finance a $600,000,000 Land Reform Program;

6. That, by virtue of the activities of Jurras Associates and Jurras, International Telephone & Telegraph Company was selected to construct a

---

1. Judgment of acquittal as to all defendants was entered on Count 2 of the indictment at the close of the government's case. The jury also convicted the corporate defendant Leon Jurras Associates, Inc. on Counts 1, 3, 4, 5 and 6 and acquitted defendant Derrick on all counts.

large rural electrification program in the Philippine Islands;

7. That there was due and owing to the defendants Jurras Associates and Jurras from International Telephone & Telegraph Company the sum of approximately $700,000, and

8. That there was then due and owing to Abraham Axelrod and A. F. Axelrod Company, Inc. from the International Telephone & Telegraph Company the sum of approximately $700,000 and that appellants could reasonably expect to receive a portion of such sum.

Initial contact with various building contractors allegedly occurred through appellants' representation that they had a large contract or a reasonable expectation of obtaining such a contract from the Philippine Government for the construction of improvements in the Philippine Islands under the Philippine Government Land Reform Program. If the contractors would make the advances sought by appellants for purposes of defraying expenses in connection with the negotiation of the contracts with the Philippine Government,[2] they would receive from appellants the subcontracts in the improvement program.

The record shows that several contractors did make advances to appellants, who in return promised to obtain contracts from the Philippine Government for the contractors and to repay the loans out of appellants' share of the money earned on the venture. Although appellants did have some connection with the Philippine Government and Axelrod, who had discussed the project with Philippine Government officials, including the National Land Reform Council of the Philippines, the project never matured. The loans that appellants received from hopeful contractors were not repaid.

■ The question of sufficiency of the evidence was properly raised by motions for judgment of acquittal at the close of the evidence and after the verdict. See Rule 29, Fed.R.Crim.P. In reviewing a district court's refusal to direct a judgment of acquittal, this Court can reverse a jury verdict of guilty only in the absence of substantial evidence to support it, viewing the evidence in the most favorable light to the government. Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1941); Fitzpatrick v. United States, 410 F.2d 513 (5 Cir. 1969). We must decide whether a reasonable-minded jury could accept the relevant and admissible evidence, considered in the light most favorable to the government, as adequate and sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt. Weaver v. United States, 374 F.2d 878, 881 (5 Cir. 1967); Riggs v. United States, 280 F.2d 949, 953–954 (5 Cir. 1960); Ahrens v. United States, 265 F.2d 514, 517 (5 Cir. 1959). Or as otherwise stated in circumstantial evidence cases, our inquiry is whether the jury might reasonably deduce from the evidence inferences which exclude every reasonable hypothesis but that of guilt. South v. United States, 412 F.2d 697, 699 (5 Cir. 1969); Montoya v. United States, 402 F.2d 847, 850 (5 Cir. 1968); Vick v. United States, 216 F.2d 228, 232 (5 Cir. 1954).

In that the sufficiency of evidence as to Counts 3 and 6 of the indictment is discussed below, the discussion here concerns only Counts 1, 4 and 5 (18 U.S.C. § 1343) and Count 7 (18 U.S.C. § 371) of the indictment.[3]

---

2. If a contractor interested in the transaction would advance money to appellants to be repaid within 120 days in order to pay expenses already incurred and to be incurred, Leon E. Jurras Associates, Inc. would enter into an agreement with the contractor. By the terms of the contract a Philippine corporation would be formed, to be owned 51% by the contractor and 49% by Leon E. Jurras Associates, Inc.

3. "§ 1343. *Fraud by wire, radio, or television*

"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent

**138**

The counts alleging violation of section 1343 charged appellants with transmitting, or causing to be transmitted, by means of wire[4] communications in interstate commerce for the purpose of executing a scheme to defraud various contractors by means of false or fraudulent representations, pretenses or promises. In challenging the sufficiency of the evidence, appellants contend the alleged false or fraudulent representations, either were not made or caused to be made by appellants or were not in themselves fraudulent or false representations. Thus appellants challenge the sufficiency of the evidence as failing to satisfy the "false or fraudulent pretenses, representations, or promises" element of section 1343, and not section 1343's requirement that the wire be used to execute the scheme.

We have carefully examined the record and are convinced that the evidence meets the required standard to support the jury's finding of guilt on each count in question—a reasonable jury could properly accept the evidence as adequate to support a conclusion of Jurras and Henderson's guilt beyond a reasonable doubt. *See generally* United States v. Andreadis, 366 F.2d 423 (2 Cir. 1966); Gorman v. United States, 323 F.2d 51 (5 Cir. 1963); Huff v. United States, 301 F.2d 760 (5 Cir. 1962); United States v. Sheiner, 273 F. Supp. 977 (S.D.N.Y.1967), aff'd, 410 F.

2d 337 (2 Cir. 1969). Viewing the evidence in the most favorable light to the government, we find ample evidence in the record of a scheme to defraud, of certain false representations which were known to be false, and of communications by wire in furtherance of that scheme. As to the conspiracy count, there is ample evidence in the record of appellants' knowledge of the conspiracy and of overt acts in furtherance of the conspiracy. *See* Atkinson v. United States, 418 F.2d 1311, 1313 (8 Cir. 1969); Huff v. United States, *supra*, 301 F.2d at 766.

Some of the evidence from which a jury could properly accept to support a conclusion of appellants' guilt beyond a reasonable doubt is as follows. Appellants claim that the alleged false representations were either not made or, if made, were not false. The evidence, viewed in a light most favorable to the government, however, is to the contrary.

*Representations No. 1 and No. 2.* Appellant Jurras informed Sam Pettigrew that he (Jurras) could verify that appellants had the contract on the social project in the Philippines. Appellant Henderson informed Farris Rookstool that appellants would be able to control the letting of construction contracts in the Philippines project and James Peterson that appellants were agents of the Philippine Government, who wanted them to secure contractors in the United States

pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both."

"§ 371. *Conspiracy to commit offense or to defraud United States*

"If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or

imprisoned not more than five years, or both."

4. The various uses of the wire to execute the scheme to defraud were: (1) Count 1—a telegram from appellant Jurras in New York to Hack Henson and Veryl Hughes in Dallas, Texas; (2) Count 4 —a telephone communication between Jurras in New York and Henson in Abilene, Texas; (3) Count 5—a money order by telegram from Henson in Abilene, Texas, to Jurras in New York. Each separate use of wire communication constitutes a separate offense under section 1343. Atkinson v. United States, 418 F.2d 1311, 1313 (8 Cir. 1969); Sibley v. United States, 344 F.2d 103, 105 (5 Cir. 1965).

to perform the construction work. Henderson also informed Alex Bickley that appellants had contracts with the Philippine Government and therefore had to find contractors to fulfill them, and that the only remaining detail was to go to the Philippines to sign the final documents. Appellants Jurras and Henderson told C. H. Lewis that they had negotiated or were in the process of negotiating with the Philippine Government. The testimony of Captain Benjamin Labayen, Director of Plans and Programs, Office of National Land Reform Council in the Philippines, demonstrates that appellants not only did not have a contract with the Philippine Government but also did not have a reasonable expectation of obtaining a contract.

*Representation No. 3.* Appellants informed Hack Henson that Abraham Axelrod was "supposedly" worth 44 to 45 million dollars. A document which described the Philippine project and which was given to various contractors by appellants stated that Axelrod and his daughter were worth 45 million dollars. The testimony of Axelrod's other daughter clearly establishes that Axelrod himself, or together with one of his daughters, was not "worth" 45 million dollars.

*Representation Nos. 4 and 5.* The same document also contained a statement that Axelrod had arranged for the sale of bonds to finance the Philippine project and, in addition, noted that the sale had been arranged through the First National Bank of Boston which would act as transfer agent for the bonds. An official of the First National Bank of Boston testified that the Bank had not entered into such an agreement.

*Representation No. 6.* The same document states unequivocally that "International Telephone and Telegraph was selected to construct the R.E.A. program." John Bishar, Vice President of I. T. & T. for the far eastern Pacific, testified that, although preliminary discussions were held, I. T. & T. never agreed to construct a project in the Philippines.

*Representation Nos. 7 and 8.* The record clearly demonstrates that appellants told several building contractors and their agents that commissions had already been earned and that their advances to appellants would be secured by the earned commissions. John Bishar of I. T. & T. testified that I. T. & T. owed no commissions to either Axelrod or appellants.[5]

Appellants further contend that contractors who advanced the money were aware of the actual situation and appreciated the risks involved and that the overall scheme was not fraudulent since it was in fact one that could reasonably be expected to succeed. The record does not support these contentions. Furthermore, this Court has held that "[t]here is no requirement that the victim be actually deceived, but only that there be a scheme to defraud, and that the telephone [and wire] be used as a step in the execution of the scheme."[6] As stated above, both of these requirements are supported by the record.

5. By discussing the sufficiency of the evidence as to the making and the falsity of *each* of the alleged false representations, we do not mean to imply that it was necessary that *all* of the misrepresentations alleged in the indictment be proved. *See* Warszower v. United States, 312 U.S. 342, 345, 61 S.Ct. 603, 85 L.Ed. 876 (1941); Conrad v. United States, 255 F.2d 247, 251 (5 Cir. 1958); Lewis v. United States, 38 F.2d 406, 410 (9 Cir. 1930); Levine v. United States, 79 F.2d 364, 369 (9 Cir. 1935); Ballard v. United States, 138 F.2d 540, 545 (9 Cir. 1943); Todorow v. United States, 173 F.2d 439, 445 (9 Cir. 1949).

6. Huff v. United States, *supra* 301 F.2d at 765. *See also* United States v. Beckley, 259 F.Supp. 567, 570 (N.D.Ga. 1965) (not necessary that there be false representation or promise; all that is necessary is a scheme calculated to deceive). In addition, section 1343 does not require that the scheme be successful, United States v. Gross, 416 F.2d 1205, 1209–1210 (8 Cir. 1969); Huff v. United States, *supra*, or that the victim of the scheme suffered a loss. United States v. Gross, *supra* 416 F.2d at 1209; Fineberg v. United States, 393 F.2d 417, 419 (9 Cir. 1968).

### Insufficiency of Evidence in Counts 3 and 6 of Indictment

Appellants Henderson and Jurras also contend that the evidence is insufficient to establish the offense of mail fraud in Counts 3 and 6 of the indictment, in that the objective of their alleged scheme to defraud was completed before the specified mailings were consummated. Therefore, their argument proceeds, the mailings were not for the purpose of executing the scheme to defraud.

Count 3 of the indictment [7] alleges that appellants caused to be mailed, for the purpose of executing the scheme to defraud, a letter on August 25, 1964, from N. Alex Bickley to C. H. Lewis, Jr. The factual background of this letter is as follows: On August 18, 1964, Lewis met in Dallas, Texas, with Oliver W. Ferguson who was at that time engaged in a joint venture with appellants with respect to the Philippine Land Reform Project. At this meeting Lewis entered into an agreement whereby he and his partner W. Todd Stewart would advance $30,000 to appellants. Contracts and a note to secure the advance were signed by Lewis and Stewart on August 18 and delivered by hand to Ferguson for the purpose of obtaining appellants' signatures. On August 21 Lewis and Stewart delivered by hand cashier's checks for the $30,000 advance to appellant Jurras. These checks were negotiated at Texas Bank & Trust Company, Dallas, Texas, on August 21 by Jurras and cleared the Dallas Clearing House on August 24. The contract and note were signed by appellants and returned to Ferguson. Ferguson delivered them to Bickley, Lewis' attorney, who in turn mailed them to Lewis on August 25, together with the letter of transmittal specified in Count 3.

Count 6 of the indictment [8] alleges that appellants caused to be delivered through the U. S. Mail a letter from appellant Jurras to Hack Henson on June 19, 1965. The record discloses that appellants obtained all of the advances made by Henson and his partner, Veryl Hughes, on or before August 20, 1964. The letter specified in the indictment was sent by Jurras at Henson's request for the specified purpose of aiding Henson to obtain a renewal of his note at the bank.

---

7. "COUNT 3

"1. The Grand Jury realleges each and every allegation of the first count of this indictment except those contained in paragraph 8 thereof.

"2. On or about August 25, 1964, in the Dallas Division of the Northern District of Texas, the defendants, LEON EDWARD JURRAS, OLIVER WENDELL HENDERSON, J. ROY DERRICK and LEON E. JURRAS ASSOCIATES, INC., for the purpose of executing the aforesaid scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, and in attempting to do so, knowingly caused to be placed in an authorized depository for mail matter, to be sent and delivered by mail, according to the directions thereon from N. Alex Bickley, Dallas, Texas, to C. H. Lewis, Jr., 501 First National Building, Temple, Texas, an envelope, containing a letter addressed to the said C. H. Lewis, Jr.

"In violation of Title 18, United States Code, Section 1341."

8. "COUNT 6

"1. The Grand Jury realleges each and every allegation of the first count of this indictment except those contained in paragraph 8 thereof.

"2. On or about June 19, 1965, in the Abilene Division of the Northern District of Texas, the defendants, LEON EDWARD JURRAS, OLIVER WENDELL HENDERSON, J. ROY DERRICK and LEON E. JURRAS ASSOCIATES, INC., having devised and intending to devise the aforesaid scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, for the purpose of executing such scheme and artifice, and in attempting to do so, knowingly caused to be delivered by United States mail according to the directions thereon, an envelope, containing, among other things, a letter addressed to Mr. Hack Henson, P.O. 5108, Abilene, Texas, dated June 17, 1965, and signed Leon E. Jurras.

"In violation of Title 18, United States Code, Section 1341."

Appellants contend that neither letter was mailed for the purpose of executing the scheme to defraud. Relying on Parr v. United States, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960) and Kann v. United States, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944), they argue that the sole objective of the scheme, *i.e.*, to obtain money as loans from contractors, had been accomplished before the letters in question were mailed.

The government argues that the scheme to defraud Lewis and Stewart (Count 3) and Henson (Count 6) had not reached fruition prior to the mailings in question; that its final objective to conceal the fraud and avoid detection had not been accomplished; and that the letters served to lull these victims into inaction and to avoid detection of the scheme.

█ A necessary element of section 1341 is that the mailing be in execution of the scheme to defraud. Kann v. United States, 323 U.S. 88, 94, 65 S.Ct. 148 (1944); Brown v. United States, 328 F.2d 652, 654 (5 Cir. 1964); Adams v. United States, 312 F.2d 137, 140 (5 Cir. 1963). The mailing is not in execution of the scheme if use of the mails is only collateral or incidental to the scheme, or made after the scheme has been fully consummated or has "reached fruition." Parr v. United States, 363 U.S. 370, 393, 80 S.Ct. 1171 (1960); Kann v. United States, *supra*; Gordon v. United States, 358 F.2d 112, 115 (5 Cir. 1966); Getchell v. United States, 282 F.2d 681, 684 (5 Cir. 1960). It is in execution of the scheme "if it is in furtherance of [the scheme] and the use of the mails should have been reasonably contemplated." Brown v. United States, *supra*. The requirement that the mailing must be in execution of the scheme is satisfied: if mail use is incident or related to an essential element of the scheme, Pereira v. United States, 347 U.S. 1, 8, 74 S.Ct. 358, 98 L.Ed. 435 (1954); if one does an act with knowledge that use of mails will follow in the ordinary course of business or where

such use can reasonably be foreseen, *id.*; United States v. Brickey, 296 F.Supp. 742, 748 (E.D.Ark.1969); if use of the mails is part of an over-all or unitary scheme to defraud, Bliss v. United States, 354 F.2d 456, 457–458 (8 Cir. 1966); Friedman v. United States, 347 F.2d 697, 710 (8 Cir. 1965); Adams v. United States, *supra*; if use of the mails occasions a delay in detection of the scheme and the delay permitted defendants to expand their scope of operations, Kann v. United States, *supra*, 323 U.S. at 194–195, 65 S.Ct. 148; *see* United States v. Sheridan, 329 U.S. 379, 391, 67 S.Ct. 332, 91 L.Ed. 359 (1946); Bliss v. United States, *supra*; if use of the mails is a means of concealing the fraud and avoiding detection, by lulling the victim into inaction, United States v. Sampson, 371 U.S. 75, 80–81, 83 S.Ct. 173, 9 L.Ed.2d 136 (1963); Gordon v. United States, *supra*; Hayden v. United States, 343 F.2d 459 (9 Cir. 1965); Beasley v. United States, 327 F.2d 566, 567–568 (10 Cir. (1964); or if use of mails was such an integral and material part of the scheme that it was foreseen and contemplated, Kloian v. United States, 349 F.2d 291, 293 (5 Cir. 1965); Brown v. United States, *supra*.

██ It is clear that *Kann* and *Parr*, relied on by appellants, do not establish "\* \* \* an automatic rule that a deliberate, planned use of the mails after the victims' money had been obtained can never be 'for the purpose of executing' the defendants' scheme. Rather the Court found only that under the facts in those cases [*Kann* and *Parr*] the schemes had been fully executed before the mails were used. And Court of Appeals decisions rendered both before and after *Kann* have followed the view that subsequent mailings can in some circumstances provide the basis for an indictment under the mail fraud statutes."

United States v. Sampson, 371 U.S. 75, 80, 83 S.Ct. 173, 176 (1962); Adams v. United States, *supra*. Therefore, appel-

lants' attack on the sufficiency of the evidence as to Counts 3 and 6 is not meritorious merely because the object of the scheme—to obtain loans from various contractors—was accomplished before the letters were mailed. The narrow issue presented is whether the letters in Counts 3 and 6 were mailed in furtherance of the alleged scheme—or in the language of the statute, "for the purpose of executing such scheme."

The letter specified in Count 3 [9] was merely a letter of transmittal from Bickley, an attorney, to his client Lewis who had previously advanced appellants $30,000 pursuant to a written contract and secured by a note. Before the letter was mailed, appellants had received the $30,000 loan; all interested parties had signed the contract and note; and the contract and note had been returned to Bickley, the victim's attorney. Instead of retaining the contract and note or delivering them by hand, Bickley mailed them to Lewis and attached the above-quoted letter.

Although section 1341 does not require that the material mailed be fraudulent in itself, see Badders v. United States, 240 U.S. 391, 36 S.Ct. 367, 60 L. Ed. 706 (1916), or be personally received or sent by the appellants,[10] the letter in Count 3 was not mailed in execution of the alleged scheme. Any connection between the letter and appellants' scheme was only incidental or collateral. Getchell v. United States, 282 F.2d 681, 684 (5 Cir. 1960); United

States v. Brickey, 296 F.Supp. 742, 748 (E.D.Ark.1969).

The government argues (1) that the letter was mailed to lull Lewis and Stewart into inaction, and (2) that appellants could have reasonably foreseen this particular use of the mails. As to the first contention, the record demonstrates that appellants did not reasonably expect or intend this letter to lull Lewis and Stewart into inaction. Mailing the contract to Lewis was entirely the decision of his attorney and was not in any way intended or contemplated by appellants.

The next argument—that appellants could have reasonably foreseen the mailing—cannot be dismissed without further discussion. At first blush, it would seem that the jury could have found that the mailing of the letter to Lewis could have reasonably been foreseen by appellants as an integral part of closing the transaction with Lewis and Stewart.[11] After examining the record, however, we have not reached this conclusion.

Appellants discussed the Philippine project not only with Lewis and Stewart but also with other contractors who also made advances to appellants and signed contracts similar to the contract between appellants, Lewis and Stewart. In the other transactions and negotiations the mails were not used during the negotiations or as part of closing the transactions. Although it is not necessary that appellants mailed the letter themselves, see note 10, supra, or that they intended the letter to be mailed, see note 11, su-

9.          "August 25, 1964
"Mr. C. H. Lewis Jr.
501 First National Bldg.
Temple, Texas
"Dear Mr. Lewis:
  Enclosed is the original of the contract of agreement as to the Philippine corporation. This is the instrument that I referred to in the phone conversation.
  I will keep in touch with you.
                Yours very truly,
                /s/ N. Alex Bickley
                N. Alex Bickley"

10. Pereira v. United States, 347 U.S. 1, 8–9, 74 S.Ct. 358 (1954); Stapp v. United States, 120 F.2d 898, 899 (5th

Cir. 1941). In Pereira the Supreme Court held that one "causes" the mails to be used if he does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen.

11. The Supreme Court in Pereira v. United States, 347 U.S. 1, 8–9, 74 S.Ct. 358, 363 (1954) concluded: "Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used." (Emphasis added.)

*pra,* the remoteness of the mailing to their scheme is an additional factor. Here, after signing the contract and notes, appellants gave them to another party to the contract who in turn delivered them to Bickley, Lewis' attorney, who decided to mail them to Lewis. Upon consideration of the entire scheme to defraud, and the particular scheme to defraud Lewis and Stewart, we cannot conclude that the mailing in Count 3 was such an integral part of the operation of appellants' scheme that its use was contemplated or foreseen. For these reasons, we find both of the government's arguments to be without merit.

█ The letter specified in Count 6 was mailed on June 19, 1965, by appellant Jurras to Hackell Henson, who had made large advances to appellants in July and August 1964. Henson had telephoned Jurras on June 17, 1965, and requested that Jurras send him some information on the present status of the Philippine project for purposes of renewing a note.

We conclude that the letter specified in Count 6 was not mailed in execution of appellants' scheme to defraud. The letter to Henson was not part of the over-all scheme of appellants to defraud, Friedman v. United States, *supra,* 347 F.2d at 710; nor was it such an integral part of the operation of their scheme that its use was foreseen and contemplated, Brown v. United States, *supra* 328 F.2d at 654; Bannister v. United States, 379 F.2d 750, 753 (5 Cir. 1967); nor was its use a means of concealment so that further frauds which were a part of their scheme could be perpetrated, Kann v. United States, *supra* 323 U. S. at 94–95, 65 S.Ct. 148; Adams v. United States, *supra* 312 F.2d at 140. The information was requested by Henson and not initiated by Jurras, and the operative facts of the scheme to defraud various contractors, as far as the record

discloses, were consummated at the latest in 1964, while the use of the mails specified in Count 6 was on June 19, 1965.

The government argues strenuously that the letter was used as a means of concealing the fraud by lulling the victim into inaction. See United States v. Sampson, *supra;* Hayden v. United States, 343 F.2d 459 (9 Cir. 1965); Beasley v. United States, *supra.* These cases, however, are not applicable to the case before us for several reasons. First, from the extensive testimony given during the trial concerning Henson's relationship with appellants and the alleged scheme to defraud, we cannot conclude that the letter of June 19, 1965 was reasonably intended or expected to lull Henson into inaction.

In addition, one common element in the "lulling" cases is that the lulling devices comprised a fundamental part of the basic scheme and its desired continued perpetration.[12] Here, the June 19, 1965 letter was only an isolated event, occurring some ten months after the advances were made, and was not a part of appellants' basic scheme to defraud.

In summary, "[i]t cannot be said that the mailings in question were for the purpose of executing the scheme, as the statute requires." Kann v. United States, *supra* 323 U.S. at 94, 65 S.Ct. at 151. Section 1341 does not purport to reach all frauds, "but only those limited instances in which the use of the mails is a part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law." *Id.* at 95, 65 S.Ct. at 151. Therefore, appellants' conviction on Counts 3 and 6 must be reversed.

*Instructions to Jury*

Appellants Jurras and Henderson next contend that the district court erred in charging the jury on the essential ele-

---

12. *See* Sampson v. United States, *supra;* Sparrow v. United States, 402 F.2d 826, 829 (10 Cir. 1968); Bliss v. United

States, *supra;* Beasley v. United States, *supra.*

ment, under sections 1341 and 1343, of intent to defraud as follows:

"It is reasonable to infer that a person ordinarily intends the natural and probable consequences of acts knowingly done or knowingly omitted. *So unless the contrary appears from the evidence*, the jury may draw the inference that the accused intended all the consequences which one standing in like circumstances and possessing like knowledge should reasonably have expected to result from any act knowingly done or knowingly omitted by the accused." [Emphasis added.]

■ The government initially argues that, assuming the charge constituted error, such error was not properly or adequately preserved by objection to the charge. We are of the view, however, that appellants' objection [13] complied with the requirements of Rule 30, Fed.R.Crim.P., that the objecting party must state distinctly the matter to which he objects and the ground of his objections. Although it could have been more succinctly stated, the objection was specific enough for the district court to perceive the basis of appellants' objection. *See* United States v. Currens, 290 F.2d 751 (3 Cir. 1961); 2 Wright, Federal Practice and Procedure § 484 (1969).

■ The charge objected to is identical to the charge which this Court condemned as constituting plain error in Mann v. United States, 319 F.2d 404 (5 Cir. 1963), cert. denied, 375 U.S. 986, 84 S.Ct. 520, 11 L.Ed.2d 474 (1964). Although other circuit courts have been highly critical of this instruction,[14] most courts have held reversal was not required when the instructions, taken as a whole, on intent were adequate and sufficiently insured against the jury's being misled.[15] Nevertheless, recent decisions by this Court demonstrate this Circuit's continued adherence to the *Mann* decision. South v. United States, 412 F.2d 697 (5 Cir. 1969); Nagell v. United States, 392 F.2d 934 (5 Cir. 1968).

The government strenuously argues that this Court has narrowly limited *Mann* in its decisions in Helms v. United States, 340 F.2d 15 (5 Cir. 1964) and Estes v. United States, 335 F.2d 609 (5 Cir. 1964). The government's reliance on these cases is misplaced. In *Estes* the charge did not contain language which was found in *Mann* to be especially harmful, *i. e.*, "unless the contrary appears from the evidence." Furthermore, the *Estes* charge contained additional instructions immediately following the alleged erroneous charge that "fraudulent intent is not presumed or assumed." Here, the alleged erroneous instruction does not contain this curative language.

In *Helms* we did not limit the *Mann* holding but merely distinguished the two cases on the basis that *Mann* dealt principally with the intent or mental state of an accused while *Helms* dealt only with objective conduct.

"In holding that the giving of the instruction was plain error, we were

---

13. In objecting to this particular charge, counsel for Jurras stated:
"I object to that part of the charge * * * [quoting the above-quoted charge] on the grounds that this permits the jury to infer the essential elements of intent to deceive in here from the acts of doing something. * * *"

14. United States v. Barash, 365 F.2d 395, 402–403 (2 Cir. 1966); Imholte v. United States. 226 F.2d 585, 591 (8 Cir. 1955).

15. McCarty v. United States, 409 F.2d 793, 799–801 (10 Cir. 1969); United States v. Tijerina, 407 F.2d 349, 355 (10 Cir. 1969); United States v. Wilkins, 385 F.2d 465, 473 (4 Cir. 1967); Cohen v. United States, 378 F.2d 751, 755–756 (9 Cir. 1967); Moore v. United States, 375 F.2d 877, 880–882 (8 Cir. 1967); United States v. Releford, 352 F.2d 36, 40 (6 Cir. 1965); United States v. Denton, 336 F.2d 785, 788 (6 Cir. 1964); Sherwin v. United States, 320 F.2d 137, 148–150 (9 Cir. 1963). In these decisions, with the exception of *Sherwin*, the court was examining the alleged erroneous instruction under the plain error doctrine of Rule 52(b), Fed.R.Crim.P.

careful to point out in Mann that '[t]he sole defense of Dr. Mann was his contention that he did not intend to evade or defeat, the tax imposed; and he denied that his conduct was wilful or that he had any evil motive or intent to defraud.' 319 F.2d at 410. The present case presents the opposite extreme. If the defendant actually instructed Borel to prepare the two sets of records and used the false tickets in making his income tax returns, there cannot be much doubt about his willfulness or criminal intent. While in both cases the government bore the burden of proving beyond a reasonable doubt the defendant's willfulness or criminal intent, in the Mann case the purely mental state was the crucial issue while here the contest centers about objective conduct, the preparation of two sets of records and the use of the false tickets in making defendant's income tax returns."

340 F.2d at 18–19.

In this case we find Mann to be controlling and therefore hold that the district court committed reversible error in giving this instruction. In Helms, if the objective conduct were proven, "there [could not] be much doubt about * * * willfulness or criminal intent." Here, a central part of appellants' defense was that they did not make statements known to be false or with the intent to defraud. As we concluded in Mann:

"When the words, 'So unless the contrary appears from the evidence' were introduced, the burden of proof was thereupon shifted from the prosecution to the defendant to prove lack of intent. If an inference from a fact or set of facts must be overcome with opposing evidence, then the inference becomes a presumption and places a burden on the accused to overcome that presumption. Such a burden is especially harmful when a person is required to overcome a presumption as to anything subjective, such as intent or wilfulness, and a barrier almost impossible to hurdle results." [16]
319 F.2d at 409.

Appellants also contend that other instructions by the district court constitute reversible error. Because we have concluded that the Mann decision requires a new trial and because we believe that the other alleged errors will probably not occur during any retrial, we will not discuss appellants' remaining objections to the instructions.

The judgment is reversed and the cause remanded for further proceedings consistent with this opinion.

Reversed and remanded.

16. Although the trial judge gave accurate charges on the necessity of intent in an alleged violation of 18 U.S.C.A. §§ 1341, 1343 and on the burden of proof, the charge complained of was not cured. Mann v. United States, *supra* 319 F.2d at 410. "Instructions to the jury must be consistent and not misleading. The fact that one instruction is correct does not cure error in giving another inconsistent one. Perez v. United States, 5 Cir. 1961, 297 F.2d 12." *Id.*