[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 05-10624

_____

D.C. Docket No. 02-20451-CR-AJ

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
December 26, 2006
THOMAS K. KAHN
CLERK

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

HUBERT GARLAND EVANS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(December 26, 2006)**

Before PRYOR and FAY, Circuit Judges, and STEELE,* District Judge.

_____

*The Honorable William H. Steele, United States District Court for the Southern District
of Alabama, sitting by designation.

STEELE, District Judge:

Appellant Evans was convicted of wire fraud under 18 U.S.C. § 1343, based on a May 22, 1997 telefax from the victim to Evans. The sole issue presented is whether the jury was entitled to find that Evans caused this telefax to be sent "for the purpose of executing" the scheme within the contemplation of Section 1343.[1] We conclude that the jury was so entitled.

## I. BACKGROUND

Evans was president of Jagar Limited, which imported produce to the Bahamas for resale. Mark Mayrsohn was president of Produce Direct, Inc. ("PDI"), which was Jagar's primary supplier of produce. In 1995, PDI acquired credit insurance from the Export-Import Bank to address the risk of non-payment by Jagar. In mid-1996, in conjunction with its application to renew its policy, PDI requested a financial report from Jagar. Jagar produced to PDI a financial statement showing the company as profitable through the fiscal year ending June 30, 1996, even though an independent auditor's report prepared in February 1997

---

[1]Section 1343 provides, in pertinent part, that "[w]hoever, having devised ... any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire ... communication in interstate or foreign commerce, any writings ... for the purpose of executing such scheme or artifice," shall be punished as set forth therein.

2

reflected that Jagar suffered a net loss of almost $1,000,000 during that fiscal year and described its survival as in "substantial doubt." The renewal policy was issued effective September 1, 1996, with a term expiring May 1, 1997. Under the terms of the policy, PDI was required to report to the insurer arrearages of over 120 days and to make reasonable collection efforts before filing a claim.

Jagar regularly purchased $100,000 or more of produce a week and, until early 1997, it paid PDI's invoices within 30 days or a bit more. At that point, Jagar's payments became smaller, such that its outstanding balance swelled to over $1,100,000 by late April. On April 25, Jagar abruptly switched suppliers, but on May 2 and May 13 it made payments to PDI totaling approximately $70,000.

On May 20, Mayrsohn telefaxed Evans a letter announcing his imminent visit to the Bahamas and requesting a meeting to discuss the companies' present and future business relations. Mayrsohn then called Jagar's bookkeeper, Diane Fletcher, and scheduled a meeting with Evans for May 26. On May 22, Mayrsohn telefaxed to Fletcher the letter on which conviction was based,[2] the body of which reads as follows:

Just a short note to confirm our meeting together with Mr. Evans on

---

[2]The indictment was not returned until May 21, 2002. Thus, all earlier communications (including transmission of the false financial statement) fell outside the statute of limitations and could not form the basis of prosecution. *See* 18 U.S.C. § 3282(a).

Monday at 2:30 p.m. at your offices.
For your review I've enclosed some preliminary information, a report of the current receivables with the aging from the invoice date. As discussed, we must stay within 120 days for the Ex-Im Bank.
Your account is right now at that limit and we should be receiving your payments now in order to keep up with the schedule.
We hope that you are preparing something to send us for this week and can continue to stay within the 120 day Ex-Im requirement.
We look forward to a positive and successful meeting together.

On May 23, Fletcher telefaxed a letter to Mayrsohn confirming the Monday meeting and listing invoices that needed to be reconciled between the parties. At the May 26 meeting in the Bahamas, Evans made clear that Jagar would not give PDI any new business or write a check on the spot, but he assured Mayrsohn that Jagar would promptly send another check and would pay off its debt. On May 30, Jagar sent PDI a check for $27,511.60, which paid in full the three oldest invoices. On June 16, Jagar sent PDI a check for $12,015.90, which paid in full the next oldest invoice. These were the last payments Jagar made, leaving an unpaid principal balance of almost $1,100,000.

The jury convicted Evans on three counts of wire fraud, involving the May 22 telefax as well as subsequent transmissions from Mayrsohn to Evans dated June 27 and July 3. The district court granted Evans' motion for judgment of acquittal with respect to the latter two letters but denied the motion with respect to the May 22 telefax.

4

## II.  STANDARD OF REVIEW

"We review de novo the denial of a motion for judgment of acquittal." *United States v. Hernandez*, 433 F.3d 1328, 1332 (11th Cir. 2005).  "When the motion raises a challenge to the sufficiency of the evidence, we review the sufficiency of the evidence de novo, drawing all reasonable inferences in the government's favor." *Id*. (internal quotes omitted).  "To affirm the denial ..., we need determine only that a reasonable factfinder could conclude that the evidence established the defendant's guilt beyond a reasonable doubt." *United States v. Perez*, 443 F.3d 772, 774 (11th Cir. 2006).

## III.  DISCUSSION

A transmission is "for the purpose of executing" the scheme if it is "incident to an essential part of the scheme." *Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 362-63, 98 L.Ed. 435 (1954).  "Letters mailed after a scheme has reached fruition cannot have been 'for the purpose of executing' the scheme within the meaning of 18 U.S.C. s 1341." *United States v. Georgalis*, 631 F.2d 1199, 1204 (5th Cir. 1980).[3]  This description of "fruition" as the critical juncture

---

[3]The mail fraud statute, like its wire fraud counterpart, applies to transmissions "for the purpose of executing such scheme or artifice."  18 U.S.C. § 1341.  Because "[t]he 'scheme or artifice to defraud' and 'for the purpose of executing' language in the mail and wire fraud statutes

5

derives from *Kann v. United States*, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944),

in which the Court held that, because the scheme "had reached fruition" before the

transmissions at issue, "[i]t cannot be said that the mailings in question were for

the purpose of executing the scheme, as the statute requires." *Id*. at 94, 65 S.Ct. at

151. Supreme Court and Eleventh Circuit cases have since repeatedly identified

"fruition" of the scheme as the point beyond which mail and wire transmissions

cannot be in furtherance of the scheme.[4] *E.g., Schmuck v. United States*, 489 U.S.

705, 711-12, 109 S.Ct. 1443, 1448, 103 L.Ed.2d 734 (1989); *United States v.*

*Maze*, 414 U.S. 395, 402, 94 S.Ct. 645, 649, 38 L.Ed.2d 603 (1974); *United States*

*v. Adkinson*, 158 F.3d 1147, 1163 (11th Cir. 1998) ("We have not hesitated to

reverse mail fraud convictions where the underlying scheme has reached fruition

prior to the mailing.").

A scheme has "reached fruition" when it is "fully consummated."

*Henderson v. United States*, 425 F.2d 134, 141 (5th Cir. 1970); *accord United*

*States v. Kent*, 608 F.2d 542, 546 & n.6 (5th Cir. 1979); *see also Kann*, 323 U.S. at

94, 65 S.Ct. at 151 ("The scheme in each case had reached fruition [because] [t]he

---

are construed identically," *United States v. Hasson*, 333 F.3d 1264, 1271 n.7 (11th Cir. 2003), we borrow freely from cases construing Section 1341.

[4]This Court sometimes uses the phrase "in furtherance of the scheme" in lieu of the quoted statutory language. *E.g., Hasson*, 333 F.3d at 1270; *United States v. Italiano*, 837 F.2d 1480, 1482 (11th Cir. 1988). The two phrases carry the same meaning.

persons intended to receive the money had received it irrevocably" and "[i]t was immaterial to them, or to any consummation of the scheme, how the bank which paid or credited the check would collect from the drawee bank.").

Evans describes the "true objective" of the scheme as getting PDI to continue supplying produce on credit. That objective, Evans continues, was fully accomplished by April 25, when Jagar stopped acquiring produce from PDI. Thus, he concludes, the scheme had reached fruition by that date, such that Mayrsohn's telefax of May 22 could not have been for the purpose of executing the scheme.[5]

To the extent Evans assumes that a scheme to defraud necessarily reaches "fruition" when the defendant receives the "fruit" of his fraud, he is mistaken. "[I]t is a well-established principle of mail fraud law that use of the mails after the money is obtained may nevertheless be 'for the purpose of executing' the fraud." *United States v. Ashdown*, 509 F.2d 793, 799 (5th Cir. 1975). "If the scheme continues, mailings made after receipt of the money can clearly support

---

[5]Evans suggests in the alternative that the scheme reached fruition when the renewal policy was issued in September 1996, apparently on the theory that, with the policy in place, PDI could have no hesitation about supplying endless produce on credit. Evans' premise is facially implausible, since the policy covered only 90% of the first $600,000 in losses, while Jagar's debt reached $1.1 million. At any rate, the superseding indictment charged, and Evans concedes, that the purpose of the fraud included actually obtaining produce on credit, not simply increasing the probability of doing so. Thus, the scheme could not have reached fruition before April 25.

7

conviction." *United States v. Knight*, 607 F.2d 1172, 1175 (5th Cir. 1979). "This is another way of saying that the scheme may embrace more than just fraudulent acquisition of money or documents." *United States v. Kent*, 608 F.2d 542, 546 (5th Cir. 1979). For example, a "two pronged" scheme may include both "writing checks on closed accounts to obtain goods and services without paying for them" and "working to retain those goods as long as possible by convincing merchants and banks that the ... checks were actually legitimate." *United States v. Lee*, 427 F.3d 881, 888 (11th Cir. 2005).

More specifically, "[p]recedent is clear that letters designed to conceal a fraud, by lulling a victim into inaction, constitute a continuation of the original scheme to defraud." *Georgalis*, 631 F.2d at 1204. That is, when the scheme includes not only obtaining the benefit of the fraud but also delaying detection of the fraud by lulling the victim after the benefit has been obtained, the scheme is not fully consummated, and does not reach fruition, until the lulling portion of the scheme concludes. The Government concedes that Evans had received the full benefit of his fraud as of April 25. The issue is whether Mayrsohn's May 22 telefax falls within this lulling doctrine.

The doctrine traces its roots to *United States v. Sampson*, 371 U.S. 75, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962):

[T]he indictment in this case alleged that the defendants' scheme contemplated from the start the commission of fraudulent activities which were to be and actually were carried out both before and after the money was obtained from the victims [and] specifically alleged that [certain documents] were mailed by the defendants to the victims for the purpose of lulling them by assurances that the promised services would be performed. We cannot hold that such a deliberate and planned use of the United States mails by defendants engaged in a nationwide, fraudulent scheme in pursuance of a previously formulated plan could not ... be found ... to be 'for the purpose of executing' a scheme within the meaning of the mail fraud statute.

*Id*. at 80-81, 83 S.Ct. at 176. The mailings at issue in *Sampson*, which were sent by the defendants to multiple victims after the defendants "had obtained all the money they expected to get from that victim," *id*. at 79, 83 S.Ct. at 175, "were designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place." *Maze*, 414 U.S. at 403, 94 S.Ct. at 650. Such transmissions fall within the lulling doctrine. *E.g., United States v. Lane*, 474 U.S. 438, 452, 106 S.Ct. 725, 733, 88 L.Ed.2d 814 (1986); *United States v. Hewes*, 729 F.2d 1302, 1321 (11th Cir. 1984); *United States v. Toney* ("*Toney I*"), 598 F.2d 1349, 1353 (5th Cir. 1979). Evans offers a number of reasons why the lulling doctrine should not apply here, but none is convincing.

First, Evans argues that the superseding indictment did not charge that his

scheme included lulling PDI into inaction after Jagar finished receiving produce on credit. This argument was not asserted in Evans' initial brief, and "[a]rguments raised for the first time in a reply brief are not properly before a reviewing court." *Herring v. Secretary, Department of Corrections*, 397 F.3d 1338, 1342 (11th Cir. 2005) (internal quotes omitted). At any rate, the superseding indictment charged that, as part of the scheme or artifice to defraud, "[t]o lull PDI and the Ex-Im Bank and prevent them from detecting Jagar's true financial condition and the falsity of Jagar's submitted financial statements, on repeated occasions [Evans] falsely represented and caused to be falsely represented to PDI that Jagar was in good financial condition, and that Jagar had the financial ability to pay its escalating outstanding balance to PDI." Evans concedes that these allegations "essentially asserted that the May 22nd fax was a 'lulling' letter."

Second, Evans argues that the lulling doctrine applies only if the defendant continues to perpetrate similar frauds, as in a Ponzi scheme. This is a common scenario, because the lulling of earlier victims facilitates the defrauding of later victims,[6] but the doctrine applies equally when, as here, there is but a single victim,

---

[6]*See, e.g., United States v. Brewer*, 807 F.2d 895, 898 (11th Cir. 1987) (applying the lulling doctrine where the scheme "was designed so that the investors' early demands for repayment were delayed for a sufficient time to allow [the defendant] to repay them by using monies which were received as more and more victims later contributed"); *Georgalis*, 631 F.2d at 1204 (applying the lulling doctrine where the defendant continued to solicit further funds from investors); *United States v. Toney* ("*Toney II*"), 605 F.2d 200, 206-07 (5th Cir. 1979) (applying

as to whom the defendant has received the full benefit of the fraud before the lulling communication. *See Lane*, 474 U.S. at 441, 452-53, 106 S.Ct. at 727-28, 733-34 (applying the lulling doctrine to a scheme to defraud one insurer in connection with one insured loss); *see also Henderson*, 425 F.2d at 141 (identifying delay in detection in order to perpetrate additional frauds, and delay in detection by lulling the victim, as separate bases for finding a mailing to be in execution of the scheme). Nor can we divine any reason why a doctrine that applies to attempts to "postpone [victims'] ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely" should be triggered when the defendants' reason for desiring to avoid apprehension is to perpetrate future frauds but not when their motivation is to escape the legal consequences of their past frauds.[7]

---

the lulling doctrine where, during the period the complaining victim was lulled, additional investors were acquired); *Toney I*, 598 F.2d at 1353 & n.6 (applying the lulling doctrine where "[a]n integral part of the scheme was reassuring past purchasers in order that future purchasers could be persuaded to buy ... distributorships," "thereby prolonging the life of the fraudulent scheme"); *see also Kann*, 323 U.S. at 94-95, 65 S.Ct. at 151 (recognizing that a mailing after the defendant has received the fruit of his fraud may be for the purpose of executing the scheme "where the use of the mails is a means of concealment so that further frauds which are part of the scheme may be perpetrated").

[7]Evans suggests that his argument is supported by *Henderson*, which noted that "one common element in the 'lulling' cases is that the lulling devices comprised a fundamental part of the basic scheme and its desired continued perpetration." 425 F.2d at 143. The *Henderson* Court did not hold that the lulling doctrine applies only when the defendant sought "continued perpetration" of the fraud, and any dearth of cases applying the doctrine when the scheme involves a single victim of a completed fraud vanished with *Lane*.

11

Evans next argues that the lulling doctrine applies to a transmission from a victim only if the transmission was preceded by a lulling communication from the defendant.[8] This Court need not resolve whether the doctrine is so restricted, because there were communications attributable to Evans prior to May 22 that a properly functioning jury could have found to be lulling. First, the checks dated May 2 and May 13 made it appear as though Jagar would honor its obligation to pay off its debt. Second, Evans' agreement (through Fletcher) to meet with Mayrsohn made it appear as though Jagar was willing to negotiate a resolution of the parties' differences. *See Toney I*, 598 F.2d at 1354 ("So long as [the victim] thought there was a possibility that matters could be settled through direct negotiations with [the defendant], he was less likely to report the fraudulent scheme.").

Evans notes that he agreed to meet with Mayrsohn on short notice, which he argues is incompatible with a lulling purpose. The jury was authorized to find otherwise, especially since a refusal to meet might have fueled Mayrsohn's suspicions, while meeting with him allowed Evans the opportunity to more

---

[8]Evans does not, and could not successfully, assert that a communication from a victim can never fall within the lulling doctrine. *See Brewer*, 807 F.2d at 897-98 (applying the lulling doctrine to demand letters from victims); *Toney I*, 598 F.2d at 1353-54 (applying the lulling doctrine to letters from a victim's attorney).

persuasively lull PDI into further delay. Moreover, the jury was entitled to view the agreement to meet, and the partial payments sent in early May, in light of Evans' conduct in the days after May 22, which the jury could easily find to be lulling: his May 23 telefax (through Fletcher) identifying particular invoices requiring reconciliation before they could be paid, and his promise at the May 26 meeting to pay off Jagar's debt, both of which falsely signaled that Jagar would uphold its obligations.

Evans also complains that Mayrsohn, by his May 20 telefax requesting a meeting, initiated the string of communications between them. Whatever the result would have been had Evans remained silent, he did not do so, and his situation is thus no different than that of the defendants in *Toney I*, who did not initiate the correspondence but who (through their company) replied and who were found liable based on subsequent letters from the victim's attorney. 598 F.2d at 1352, 1354.

Evans next argues that the May 22 telefax lulled no one but instead advanced the discovery of his fraud. As to the former point, the success of the lulling effort is immaterial. *Hewes*, 729 F.2d at 1321 ("[T]he failure of the letters actually to lull all of Rekcus's creditors does not relieve the appellants of criminal liability [because] [s]uccess of the fraudulent scheme is not an element of a Section 1341

13

offense."); *Toney I*, 598 F.2d at 1354 n.8 ("Regardless of whether the content of the two letters [by the victim's attorney] had the effect of lulling anyone, ... the jury could reasonably find that the participants in the fraudulent scheme intended that [the attorney's] writing and mailing of the count letters would at least delay further complaints.").

As to the latter, while a transmission from a victim may not be in furtherance of the scheme if its "only likely effect would be to further detection of the fraud," *United States v. LaFerriere*, 546 F.2d 182, 187 (5th Cir. 1977), that principle has been applied by this Court only when the victim recognizes the likelihood of fraud and threatens to sound the alarm if not swiftly satisfied.[9]  Here, the May 22 telefax did not demand immediate satisfaction but simply reminded Evans that PDI would have to report arrearages over 120 days and expressed the "hope" that Jagar would send sufficient funds to stay inside that boundary.  Nor did PDI's apparent intent to comply with its insurer's reporting requirement communicate a threat to involve the authorities in ferreting out a fraud, especially one which neither the telefax nor the evidence at trial indicates Mayrsohn then suspected.  Evans' related suggestion that

---

[9]In *LaFerriere*, the victim " strongly suspected that he was a victim of fraud," and his attorney's letter "demand[ed]" satisfaction "within five days of receipt of this letter," failing which the victim would make an "immediate complaint" to the state insurance commission and also "press both civil and criminal action."  546 F.2d at 185 n.3, 186.

14

the telefax helped fulfill PDI's obligation to make reasonable collection efforts before seeking insurance benefits and thus "inch[ed] [PDI] closer to the date upon which it could make a claim," at best illustrates the unhelpful truism that, with each passing day, a fraud comes closer to exposure as the remaining potential delay in its discovery declines.

Finally, Evans argues that, in order to support conviction, his scheme as originally hatched in 1996 must have included receiving communications such as the May 22 telefax. For this he relies on *Sampson*, in which the Court noted that the "scheme contemplated from the start" the use of lulling communications to persuade investors that the promised services would be performed. 371 U.S. at 80, 83 S.Ct. at 176. Assuming without deciding that the intention to lull must be part of the scheme from its inception, the intention to lull in any particular manner need not be. On the contrary, "[a]s the execution of the scheme ... proceeds, new ways may be adopted or invented to effectuate the original design," since "[m]ere details may be changed and the scheme remain the same." *Weiss v. United States*, 122 F.2d 675, 680 (5th Cir. 1941). Evans does not challenge the superseding indictment's allegation that the scheme originally included lulling by means of affirmative misrepresentations of Jagar's financial health. It is thus irrelevant whether the scheme also originally included lulling by other means.

Undeterred, Evans maintains that his scheme never included receiving communications from the victim. The jury, however, was entitled to find otherwise. As discussed above, by sending two teasing checks and agreeing to meet and discuss the parties' business relations, Evans appeared to engage in lulling activity, especially when viewed through the prism of his post-May 22 behavior. The very purpose of lulling activity is to keep the victim dealing with the defendant rather than with the authorities, and the agreement to meet on May 26 was a clear indication that PDI should continue to deal with Evans. Mayrsohn's May 22 telefax confirming the meeting and preparing for it did precisely that and was thus part and parcel of the scheme to delay detection of the fraud by lulling PDI into believing that the parties' difficulties would be worked out. To borrow from *Toney I*, "[i]f, as the jury could find, [Evans'] motive in inviting [PDI] to continue the correspondence was to lull [PDI] into deferring any complaint to the authorities, then [Mayrsohn's] responses were an integral part of [Evans'] fraudulent scheme." 598 F.2d at 1354. The May 22 telefax was, in short, "incident to an essential [lulling] part of the scheme." *Pereira*, 347 U.S. at 8, 74 S.Ct. at 362-63.

## IV. CONCLUSION

The jury's determination that Evans caused the May 22 telefax to be sent "for the purpose of executing" his scheme is consistent with governing law and is supported by sufficient evidence. The trial court thus properly denied Evans' motion for judgment of acquittal.

**AFFIRMED.**