[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-14999
_____

D.C. Docket No. 1:15-cr-20032-DPG-3

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

BRIAN DERONCELER,
LATASHA PHARR,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(March 22, 2018)

Before MARTIN, JORDAN and GINSBURG,[*] Circuit Judges.

GINSBURG, Circuit Judge:

Brian Deronceler and Latasha Pharr each appeal their convictions on charges of aggravated identity theft, bank fraud, and conspiracy to commit bank fraud, in violation of 18 U.S.C. §§ 1028A, 1344, and 1349, respectively. The appellants were tried in a single jury trial, and both are presently incarcerated. Deronceler is serving a sentence of 183 months, Pharr 259 months.

Deronceler and Pharr raise seven issues on appeal. Both argue (1) the evidence is insufficient to support their respective conspiracy convictions, which Deronceler also advances as an appeal from the denial of his motion for Judgment of Acquittal. Pharr separately argues the district court erred by (2) denying her request for a jury instruction regarding the entrapment defense and (3) including victims and losses associated with crimes committed by others when calculating her sentence. Deronceler separately adds four more issues, (4) arguing the evidence is insufficient to support his convictions for bank fraud and aggravated identity theft, (5) appealing certain evidentiary objections made and rejected at trial, (6) alleging the prosecutor engaged in misconduct during her closing argument, and (7) challenging aspects of his sentencing.

---

[*] Honorable Douglas H. Ginsburg, United States Circuit Judge for the District of Columbia Circuit, sitting by designation.

Having reviewed the record and the parties' briefs, and with the benefit of oral argument, we vacate Pharr's sentence and remand her case to the district court for resentencing. We affirm Pharr and Deronceler's convictions in all other respects.

## I.    BACKGROUND

Deronceler and Pharr were convicted of offenses stemming from a scheme to create and to cash fraudulent checks. Several other members of the alleged conspiracy pleaded guilty and were sentenced separately. *See, e.g.*, *United States v. Presendieu*, 880 F.3d 1228 (11th Cir. 2018) (affirming the conviction of co-conspirator Presendieu, vacating the sentence of co-conspirator Jean, and remanding for resentencing). Because Deronceler and Pharr challenge the sufficiency of the evidence, we review the facts in detail.

## A.    Relevant Facts

Deronceler and Pharr both provided fraudulent checks to Husein Ali Habib, who owned a Kwik Stop convenience store in Boca Raton, Florida. Habib's store included a check cashing service; in addition to legitimate checks, Habib cashed fraudulent checks. When cashing checks Habib knew to be fraudulent, he demanded a fee equal to 20%, 30%, or even 50% of the face value of the check.

Each transaction would begin with an individual preparing a fraudulent check made out to an unwitting third party, for example, "Jane Doe." The bearer

3

would also forge Jane Doe's endorsement of the check and present fake identification purportedly from Jane Doe. For larger checks the bearer would also provide a thumb print – purposely smudged beyond recognition – purporting to be Jane Doe's. Habib would immediately pay his co-conspirator a portion of the face value of the check in cash. He would then deposit the check at Bank of America, SunTrust, or another FDIC-insured commercial bank, which in turn would seek payment from the issuing institution, whether the U.S. Treasury or another bank.

Habib trafficked in fraudulent checks presented by a rotating cast of characters. In 2010 he began dealing with Jason Miles. When several of the checks provided by Miles were returned unpaid, Habib ceased dealing with him. Miles then introduced Habib to Stanley Presendieu, whom he called the "head of the horse," and Habib began cashing checks for Presendieu. Habib ceased cashing Presendieu's checks sometime in 2012, whereupon Presendieu introduced Habib to Grace Vila. In January 2013 Habib ceased cashing checks for Vila, who then introduced him to defendant Pharr.

Vila explained that Pharr was Presendieu's ex-girlfriend and that she used to cash checks for Presendieu, but they had fallen out so Pharr was going out on her own. Habib agreed to cash checks for Pharr and began doing so in March 2013. Because Habib had lost money on returned checks provided by Presendieu, and because Pharr was connected to Presendieu, Pharr and Habib agreed that Habib

4

would recoup his losses by charging her a fee of 50%, which was significantly above the 20% fee they had previously contemplated.

Pharr was also the office manager of a tax preparation firm called "B.D. Tax," an enterprise established by Presendieu in Pharr's name and using her federal electronic filing identification number (EFIN). B.D. Tax was responsible for preparing the tax returns of several victims of identity theft, including M.C., J.S., and T.A. Presendieu tendered fraudulent checks made out to M.C. and J.S. in 2011, which Habib then cashed. Pharr later told Habib that she gave Presendieu checks to cash at Habib's Kwik Stop in 2012 and described Presendieu as her "business partner."

The FBI raided Habib's business in June 2013. Habib opted to cooperate with the FBI and became a confidential informant. After the raid, Pharr temporarily ceased doing business with Habib, and Habib resumed his relationship with Presendieu. When the FBI instructed Habib to cut off Presendieu, Presendieu introduced him to Scarlee Valais Jean. When the FBI cut off Jean, she introduced Habib to Brian Deronceler.

Deronceler and Habib met in November 2013. Deronceler described himself as "the boss," said he was there "to take care of things" and to "get things going," and said he had heard there had been "confusion" between Habib and Presendieu. He also reassured Habib that Presendieu "is not part of my entourage at all." Over

5

the following months, Deronceler brought Habib several fraudulent checks and fake identification cards, which Habib purported to cash for him. When Habib berated Deronceler for the poor quality of his identification cards, Deronceler brought Habib four fake cards, prepared by different suppliers, and asked Habib to choose one. Deronceler also forged some signatures in Habib's presence. Deronceler boasted he would supply Habib with millions of dollars of fraudulent checks. Habib and Deronceler ceased doing business in early 2014.

In June 2014, just as Deronceler exited the picture, Pharr contacted Habib seeking to cash checks. During their conversations, Habib asked why Pharr had stopped cashing fraudulent checks, and she responded that "the volume was too low so I just said forget it." She told Habib she was "not doing it now" because "the season [is] over anyway," but that "come next year ... there's a possibility I could put something together." She also promised Habib that she was "not dealing with Stanley [Presendieu]."

In July 2014 Pharr brought Habib several fraudulent U.S. Treasury checks, which she told Habib she received from a friend who had "connections." Pharr also procured fake identification cards from a supplier who charged her $100 each, and boasted that she had "a good team," none of whom "like Stanley [Presendieu]." Habib cashed those checks and another batch Pharr provided in October 2014.

6

During their dealings in 2014 Habib and Pharr made plans to cash many fraudulent checks during the upcoming 2015 tax refund season.  Pharr told Habib that business would "boom" in January so each of them could live "like a rock star."  She also told Habib she had brought in a "partner" for next year.

The FBI arrested Stanley Presendieu in January 2015. Habib did not hear from Pharr thereafter.

## B.     Procedural History

Deronceler and Pharr were subsequently arrested.  The Government issued a 41-count indictment alleging both Deronceler and Pharr were members of a larger group – which also included Habib, Miles, Presendieu, Vila, and Jean – that conspired to commit bank fraud and committed both bank fraud and aggravated identity theft.  Habib sought leniency and testified against his alleged co-conspirators.

Deronceler and Pharr were tried together in June 2016.  Deronceler represented himself until sentencing, while Pharr was represented by counsel.  The Government presented the evidence described above.

Deronceler's defense at trial was that he had an "evil twin" named Brian Dehonslley who had committed the crimes.  For her part, Pharr attacked Habib's credibility and argued someone else had stolen her identity and committed the crimes.

The jury returned a verdict of guilty on all counts. Deronceler moved for a Judgment of Acquittal, which the district court denied.

A probation officer prepared a presentence report (PSR) for Deronceler outlining his role in the conspiracy. Deronceler's PSR initially included a criminal history that, under the Guidelines, produced five criminal history points and put him in criminal history category III. Deronceler objected to various aspects of his PSR, and the Government filed its own objection. Deronceler's PSR was subsequently amended to include an additional crime, which brought his criminal history score to seven points, corresponding to criminal history category IV.

Deronceler's PSR estimated that the conspiracy was responsible for a total intended loss of $4,740,954.67, of which Deronceler was responsible for $193,132.53. It also estimated Deronceler was responsible for more than 250 victims. Using these figures as inputs in the analysis mandated under § 2B1.1 of the 2015 Guidelines, the PSR calculated a total offense level of 23. When used in conjunction with his criminal history, the PSR calculated a Guidelines prison sentence of 70 to 87 months for the bank fraud and conspiracy charges and an additional sentence of two years, to be served after the initial sentence, for each of the four aggravated identity theft charges, with the court to determine whether they are to run consecutively or concurrently.

8

A probation officer also prepared a PSR for Pharr estimating that she was responsible for an intended loss of $2,811,059.57 and 250 or more victims. These figures included victims and financial losses caused by many of her co-conspirators, including Presendieu, Vila, and Jean, because the probation officer deemed them "reasonably foreseeable" aspects of Pharr's participation in the overall conspiracy. Pharr objected unsuccessfully to this part of her PSR. Using these figures as inputs in the analysis mandated under § 2B1.1 of the 2014 Guidelines, the PSR calculated a total offense level of 35. It also reviewed her criminal history, again pursuant to the Guidelines, assessing her four criminal history points, which put her in criminal history category III. The PSR calculated a Guidelines sentence range of 210 to 262 months imprisonment for the bank fraud. It also calculated an additional sentence of two years, to be served after the initial sentence, for each of the three aggravated identity theft charges, with the court to determine whether they are to run consecutively or concurrently.

At sentencing Deronceler sought a minor role reduction and a downward sentence variance due to a claimed mental handicap. The district court declined these requests, deemed him responsible for an intended loss of $109,378.23 and 10 or more victims, and sentenced him to 183 months in prison and restitution of $109,378.23. Pharr successfully objected to the inclusion of two criminal history points for committing offenses during probation, arguing she was not directly

9

involved in the conspiracy during her probationary period.  The district court granted her the "benefit of the doubt" and accordingly reduced her criminal history category to II and sentenced her to 259 months imprisonment and restitution of $2,811,059.

## II. COMMON ISSUE ON APPEAL

Both defendants argue the prosecution failed to prove they were part of the alleged conspiracy to commit bank fraud.  Deronceler also appeals the denial of his Rule 29 Motion for Judgment of Acquittal, which is functionally the same as a challenge to the sufficiency of the evidence.  *United States v. Gamory*, 635 F.3d 480, 497 (11th Cir. 2011).

"We review both a challenge to the sufficiency of the evidence and the denial of a Rule 29 motion for judgment of acquittal *de novo*."  *Id.*  When doing so, we "view the evidence in the light most favorable to the government, making all reasonable inferences and credibility choices in the government's favor, and then determine whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt."  *Id.* (internal quotation marks and citations omitted).  We will uphold the denial of a Rule 29 motion if we "determine that a reasonable fact-finder could conclude that the evidence established the defendant's guilt beyond a reasonable doubt."  *Id.* (internal quotation marks and citations omitted).

10

"To convict for a conspiracy to commit bank fraud, the government must establish that (1) a conspiracy existed; (2) the defendant knew of it; and (3) the defendant knowingly and voluntarily joined it." *United States v. Presendieu*, 880 F.3d at 1240 (citations and internal quotation marks omitted); *see* 18 U.S.C. § 1349.

Deronceler argues that the only evidence tying him to the conspiracy is inadmissible hearsay, Br. at 24, an argument he also raises as an evidentiary objection, which we address below. Br. at 37-38. For the reasons explained there, this evidence was properly admissible. It is also sufficient to support the conspiracy conviction: Habib testified that Deronceler introduced himself as the "boss" of the operation who had been brought in to "get things going." The evidence also links Deronceler to Jean, who introduced him to Habib. That is itself enough evidence to establish (1) an agreement and (2) his knowing and voluntary participation in it.

Pharr likewise objects to the sufficiency of the evidence tying her to a single conspiracy, arguing there were if anything several separate conspiracies. She argues she did not know all of the other conspirators and worked separately from them. Pharr argues that under *United States v. Ellis*, 709 F.2d 688, 690 (1983), a single "hub and spoke" conspiracy cannot be proven if the spokes did not know each other and acted separately.

11

Our law on this question is clear. "[I]f the evidence showed one large conspiracy with [a defendant] as the hub, the three appellants as the spokes, and some interaction between [them] to provide the rim, then the defendants could have been joined in one indictment." *Ellis*, 709 F.2d at 689-90. "We will not reverse a conviction because a single conspiracy is charged in the indictment while multiple conspiracies may have been revealed at trial unless the variance is material and substantially prejudiced the defendant." *United States v. Edouard*, 485 F.3d 1324, 1347 (11th Cir. 2007) (internal quotation marks and citations omitted). If the variance is not material, then "we will not disturb the jury's verdict" where "the government presented evidence sufficient to establish a common goal, underlying scheme, and overlap in participation." *Richardson*, 532 F.3d at 1286.

Drawing all inferences in favor of the Government, *Gamory*, 635 F.3d at 497, we conclude the Government properly charged a single conspiracy and presented evidence sufficient to establish a common goal, underlying scheme, and overlapping participation. Whether one conspiracy or several, each co-conspirator had the same goal, cashing fraudulent checks. The evidence also indicates a common underlying scheme: both Deronceler and Presendieu described themselves as supervisors, suggesting both a larger organization and a hierarchy within it. There is ample evidence of overlapping participation, both in the chain

12

of introductions to Habib and in their actual dealings, including Presendieu's use of checks payable to two clients of Pharr's tax service, M.C. and J.S., and Pharr's agreement to compensate Habib for losses he sustained when dealing with Presendieu.

### III.    ISSUES RAISED ONLY BY PHARR

Pharr alone raises two separate issues.  She argues the district court abused its discretion, first when it denied her request for a jury instruction concerning the affirmative defense of entrapment, and second by including in its sentencing calculations certain financial losses and victims attributable to co-conspirators.

### A.    Entrapment Defense

"An affirmative defense of entrapment requires two elements: (1) government inducement of the crime; and (2) lack of predisposition on the part of the defendant." *United States v. Sistrunk*, 622 F.3d 1328, 1333 (11th Cir. 2010). "To raise an entrapment defense, a defendant must prove more than that the government first solicited him or merely provided the opportunity for the crime." *Id.* (internal quotation marks and citations omitted).  Rather, the defendant must show "some evidence," meaning "more than a scintilla," *United States v. Alston*, 895 F.2d 1362, 1367 (11th Cir. 1990), of Government "persuasion or mild coercion" to commit the crime, *Sistrunk*, 622 F.3d at 1333 (citation omitted).  We apply a burden-shifting framework in which "the defendant bears the initial burden

13

of production as to government inducement," which, if met, then shifts "to the government to prove beyond a reasonable doubt that the defendant was predisposed to commit the crime." *United States v. Ryan*, 289 F.3d 1339, 1343 (11th Cir. 2002).

This court reviews the denial of a requested jury instruction for an abuse of discretion. *United States v. Hill*, 799 F.3d 1318, 1320 (11th Cir. 2015); *United States v. Ryan*, 289 F.3d 1339, 1343 (11th Cir. 2002). We have not yet had occasion to clarify whether that standard or the *de novo* standard applies to an appeal challenging the denial of a requested jury instruction on entrapment. *See Sistrunk*, 622 F.3d at 1332-33. As explained further below, we need not resolve the question here because the result would be the same under either standard.

Pharr argues the evidence presented at trial provides enough evidence of entrapment to create a jury issue. She notes three items in particular. First, she argues Habib, acting as the Government's confidential informant, pursued her by returning her phone calls and by telling her he could help her. Second, she argues Habib "admitted, on the stand, that he did not follow the rules" when speaking with her. Br. at 13. Third, she argues, without any citation, that Habib failed to record two minutes of a particular conversation. She argues "[a] jury could have found that Ms. Pharr was no longer interested in pursuing [fraudulent] checks, was only calling Mr. Habib to assist her with a valid check, and was entrapped by Mr.

14

Habib into committing further crimes." Br. at 13-14. The Government vigorously disputes these points.

Regardless whether Pharr has shown government persuasion or mild coercion, which is doubtful, her effort fails because the government can easily meet its burden of showing she was an "unwary criminal" predisposed to commit the charged crime. For example, Pharr produced and cashed fraudulent checks – both herself and in concert with other co-conspirators – before the 2014 events of which she complains and before Habib became an informant. Although this activity ceased for a time, the evidence suggests that was because of the seasonal nature of the tax fraud scheme rather than a sudden change of heart. There is also evidence she purchased and used fake identification cards. We have found similar facts sufficient to establish predisposition. *See, e.g.*, *United States v. Rutgerson*, 822 F.3d 1223, 1235-36 (11th Cir. 2016) (predisposition to solicit a minor); *United States v. Aibejeris*, 28 F.3d 97, 99 (11th Cir. 1994) (predisposition to launder money). Therefore, the district court did not err in refusing to give an entrapment instruction because on this record no reasonable juror "could entertain a reasonable doubt about whether [Pharr] was entrapped." *United States v. Alston*, 895 F.2d 1362, 1367 (11th Cir. 1990).

This result is the same whether we review the denial of this instruction for an abuse of discretion or *de novo*. Therefore we leave for another day the selection of the appropriate standard of review.

## B.    Pharr's Sentence

When sentencing Pharr, the district court included financial losses and victims caused by her co-conspirators. Pharr challenges the inclusion of these sums, arguing that she was personally responsible for "roughly 100 victims," not the 250 for which she was sentenced, and $256,000 in financial losses, not approximately $2.8 million. Br. at 14-15. Echoing her appeal concerning the sufficiency of the evidence, she argues she was not part of a single, large conspiracy and therefore should not be sentenced on the basis of all the losses it generated. If the court counted only the losses she personally caused, she asserts the U.S. Sentencing Guidelines would have called for a sixteen level sentencing enhancement (twelve levels for the financial sum and four levels for the number of victims) rather than the twenty-four level enhancement (consisting of eighteen and six levels, respectively) she received. Br. at 17.

While Pharr's appeal was pending, this court decided an appeal lodged by two of her co-conspirators, Presendieu and Jean. Jean appealed, *inter alia*, the inclusion of victims and financial losses associated with Pharr in Jean's Guidelines sentence range. We concluded that at sentencing the relevant conduct of other co-

conspirators is limited to "jointly undertaken criminal activity," which may be narrower than the totality of the conspiracy.  *Presendieu*, 880 F.3d at 1245-46. Applying this principle, we held that, "[b]ecause no evidence supports the determination that Pharr's activity in June to October 2014 was within the scope of Jean's jointly undertaken criminal activity, the district court clearly erred in holding Jean responsible for the approximately $84,000 of loss incurred as a result of Pharr's independent check-cashing activity." *Id.* We therefore vacated Jean's sentence and remanded the case to the district court for resentencing after recalculating the loss attributable to Jean. *Id.* at 1246.

Jean's appeal concerned only the proper loss amount, but the clear error standard applies both to "the District Court's calculation of the number of victims," *United States v. Rodriguez,* 732 F.3d 1299, 1305 (11th Cir. 2013), and to the loss attributable to the defendant, including "losses resulting from the reasonably foreseeable acts of co-conspirators in furtherance of the conspiracy." *United States v. Rodriguez*, 751 F.3d 1244, 1256 (11th Cir. 2014).  Having already concluded in *Presendieu* that it was clear error for a district court to include losses associated with Pharr's 2014 activities when sentencing Jean, we similarly conclude that it was clear error to include both losses and victims associated with Jean when sentencing Pharr.  The record is devoid of any evidence directly connecting the

17

two defendants, so their respective crimes are not "jointly undertaken criminal activity" within the meaning of § 1B1.3 of the Guidelines.

We therefore vacate Pharr's sentence and remand her case to the district court for resentencing. In addition to excluding victims and losses associated with Jean's criminal activity, the district court should exclude from its calculations financial losses and victims associated with the activity of any other co-conspirator who is not connected to Pharr by any evidence.

In vacating, we reject the Government's assertion that any error is harmless because the district court said it would have imposed the same sentence "under any circumstances." Br. 66-67. What this argument overlooks is that if Pharr received a lesser enhancement under the Guidelines, then her resulting sentence range would be lower, and the sentence imposed would exceed the range recommended by the Guidelines. "We ordinarily expect a sentence within the Guidelines range to be reasonable," *United States v. Gonzalez*, 550 F.3d 1319, 1324 (11th Cir. 2008), but not when, as here, the present sentence would exceed the recommended range if the sentence were recalculated using the revised figures. Because the sentence does not appear to be reasonable in light of *Presendieu* and because the record is bereft of any rationale for departing upward from the Guidelines range, the sentence must be vacated. *See, e.g.*, *United States v. Livesay*, 525 F.3d 1081, 1094 (11th Cir. 2008).

18

## IV.    ISSUES RAISED ONLY BY DERONCELER

Deronceler separately raises four issues.  First, he challenges the sufficiency of the evidence supporting his conviction for two offenses, bank fraud and aggravated identity theft.  Second, he appeals the district court's denial of various evidentiary objections he made at trial.  Third, he argues the prosecutor engaged in misconduct.  Fourth, he challenges three aspects of his sentence.

### A.    Sufficiency of the Evidence

Deronceler challenges both the sufficiency of the evidence supporting his convictions for bank fraud and aggravated identity theft and the district court's denial of his motion for Judgment of Acquittal.  As noted above, we review both issues *de novo*.  *Gamory*, 635 F.3d at 497.  "The test for sufficiency of the evidence is identical, regardless of whether the evidence is direct or circumstantial, but if the government relied on circumstantial evidence, reasonable inferences, not mere speculation, must support the conviction."  *United States v. Martin*, 803 F.3d 581, 587-88 (11th Cir. 2015) (internal citations and quotation marks omitted).

### 1.    Bank fraud

Deronceler argues the Government failed to establish two elements of bank fraud (Counts 17-20).  In order to convict for this offense, "the government must prove (1) that a scheme existed to obtain moneys, funds, or credit in the custody of a federally-insured bank by fraud; (2) that the defendant participated in the scheme

19

by means of material false pretenses, representations or promises; and (3) that the defendant acted knowingly." *Presendieu*, 880 F.3d at 1240 (citations and internal quotation marks omitted); *see* 18 U.S.C. § 1344.

Deronceler argues the Government failed to prove he had the specific intent to commit bank fraud because "none of the government's witnesses could testify about [his] knowledge or intent." Br. at 27-29. He also argues the Government failed to prove he had the intent to "defraud a financial institution," although the Government may, as he acknowledges, use circumstantial evidence to prove its case. *Id.* at 28. The Government in response points to the following evidence: (1) recorded meetings during which Deronceler cashed checks payable to other persons; (2) Habib's testimony that Deronceler forged signatures for these checks in his presence, and in at least one case during a recorded meeting; and (3) a recorded discussion in which he promised co-conspirator Habib that he would get a better manufacturer of fake identification documents.

This evidence is sufficient to establish that Deronceler acted knowingly. There is ample evidence that Deronceler commissioned the production of false identification cards, which he then used to cash checks payable to others, and that he forged payee signatures when endorsing some of these checks.

We also find the evidence sufficient to establish that Deronceler knowingly defrauded a federally-insured bank. Neither defendant objected to the

20

Government's certification that the institutions involved – Bank of America, SunTrust, Citizens Bank, UMB Bank, and Ohio Valley Bank – "are FDIC banks." By cashing checks purportedly issued by or cleared through these institutions, Deronceler knowingly defrauded them.

### 2.    Aggravated identity theft

Deronceler also argues the Government failed to establish he knowingly committed aggravated identity theft (Counts 38-41).  Br. at 29.  He argues that, because the victims who testified "confirmed that [they] did not know Deronceler" and "could not say that Deronceler stole [their] identit[ies]," there is "no evidence or testimony" that he knew any identities were fake or used them without proper authority.  *Id.*

"To convict for aggravated identity theft, the government must prove that the defendant: (1) knowingly transferred, possessed, or used; (2) the means of identification of another person; (3) without lawful authority; (4) during and in relation to a felony enumerated in 18 U.S.C. § 1028A."  *Presendieu*, 880 F.3d at 1240 (citations and internal quotations omitted).  Bank fraud is one of the felony offenses enumerated in the relevant statute.  *See* 18 U.S.C. § 1028A(c)(5).

We find the evidence in the record sufficient to establish the requisite knowledge.  Habib testified that Deronceler forged check endorsements in his presence and offered several variants of identification cards he knew to be

21

fraudulent.  Although Deronceler may challenge Habib's credibility, we "view the evidence in the light most favorable to the government, making all reasonable inferences and credibility choices in the government's favor."  *Gamory*, 635 F.3d at 497.  We therefore credit Habib's testimony and find it sufficient to establish that Deronceler committed aggravated identity theft.

**B.    Evidentiary Rulings**

Deronceler objects to various evidentiary rulings, which we group into three categories: those challenging (1) relevance; (2) the scope of witness examinations; and (3) alleged hearsay.

This court "review[s] a district court's evidentiary rulings for abuse of discretion"; in doing so we evaluate preserved evidentiary objections for material, that is, non-harmless error and objections first raised on appeal "for plain error only."  *United States v. Baker*, 432 F.3d 1189, 1202 (11th Cir. 2005).  During this review, we bear in mind that "[t]he district court has broad discretion to determine the relevance and admissibility of any given piece of evidence."  *United States v. Merrill*, 513 F.3d 1293, 1301 (11th Cir. 2008).

**1.    Relevance objections**

Deronceler objected at trial to the relevance of various exhibits and testimony offered by the Government regarding his co-conspirators and a victim. He argues the evidence was more prejudicial than probative.  Br. at 35.  The

Government responds that the challenged evidence was relevant to prove the existence of the charged conspiracy, to explain the meaning of the word "stats" (a term referring to U.S. Treasury checks, which appears in other evidence), to establish the credibility of witness Habib, and to establish that the co-conspirators used fraudulent identification documents. Br. at 46-48. Because Deronceler registered his objection at trial, we review the district court's admission of the evidence for material error. *Baker*, 432 F.3d at 1202.

Deronceler's relevance objections fail under this standard of review. Proving the existence and scope of the conspiracy was clearly relevant to the conspiracy offenses with which he was charged. For example, the introduction of the testimony concerning Deronceler's use of fraudulent identification documents is relevant to all three of his charges, aggravated identity theft, bank fraud, and conspiracy to commit bank fraud. Evidence explaining the meaning of the term "stats" is similarly relevant to understanding how the conspiracy worked.

### 2. Scope of witness examination

Deronceler also appeals two restrictions the district court placed upon his examination of witnesses. First, Deronceler argues the district court abused its discretion by restricting his cross examination of witness A.S., a victim of the conspiracy. Br. at 36. He does not explain what the district court restricted him from doing or how it prejudiced him. As a result, there is nothing for us to review.

23

Second, Deronceler appeals a ruling barring him from asking his sister Ileene Deronceler about her memory on direct examination. Br. at 37. As Deronceler himself notes, however, the judge reconsidered his ruling and advised Deronceler he could ask those questions. Deronceler argues he failed to follow up because he was confused. Yet, as the Government points out, Deronceler then asked several questions and later affirmed that he did not have any further questions to ask. Having prevailed on the issue before the district court and asked all the questions he wished, there is again nothing for us to review on appeal.

### 3.     Hearsay objections

Deronceler appeals various evidentiary rulings he labels hearsay objections. None has any merit.

First, Deronceler objected to the introduction of several self-authenticated documents, arguing the Government failed to authenticate them by eliciting testimony. Br. at 37. The documents in question are bank records which, as self-authenticating documents, are hearsay-excepted. *See* FED. R. EVID. 803(b); *United States v. Naranjo*, 634 F.3d 1198, 1213-14 (11th Cir. 2011). As such, the documents were properly admitted into evidence.

Second, Deronceler objects to statements that Habib testified had been made by Presendieu concerning the conspirators' use of false identification cards. Br. at 38-39. According to Habib, Presendieu made the statements to induce Habib to

24

continue cashing checks provided to him by Presendieu or a co-conspirator. An out of court statement is not inadmissible hearsay if it "was made by the party's co-conspirator during and in furtherance of the conspiracy." FED. R. EVID. 801(d)(2)(E).[1]

Deronceler also argues Habib's testimony violates his right under the Confrontation Clause of the Sixth Amendment to the Constitution of the United States to confront the witnesses against him. The statement in question was made by the defendant's co-conspirator in furtherance of the conspiracy. Under these circumstances, we have held the Sixth Amendment does not bar its admission. *See United States v. Underwood*, 446 F.3d 1340, 1347-48 (11th Cir. 2006); *United States v. Cross*, 928 F.2d 1030, 1051-52 (11th Cir. 1991).

Third, Deronceler argues testimony of a federal agent, Degnan, identifying the name of the tax preparation company used by another co-conspirator, is inadmissible hearsay. Br. at 38-39. Because the challenged statement was made in court and apparently based upon the witness's personal knowledge, it is not hearsay.

---

[1] Deronceler objects for the first time in his reply brief that the same evidence was more prejudicial than probative. Reply Br. at 10. "Arguments raised for the first time in a reply brief are not properly before a reviewing court," *United States v. Evans*, 473 F.3d 1115, 1120 (11th Cir. 2016), and even if it were properly before us, the district court did not clearly err by concluding the statements of a co-conspirator was more probative than prejudicial.

## C.    Prosecutorial Misconduct

Deronceler argues the prosecutor engaged in misconduct during her closing arguments by playing upon the sympathy of the jury. In particular, Deronceler objects to the prosecutor's exhortation that the jury should "speak ... the truth" when rendering their verdict. Deronceler contends this statement denied him a right to a fair trial, requiring this court to grant habeas corpus and vacate his conviction. Br. at 41. The Government responds that the comment was not prejudicial when viewed in context and quotes the entire closing argument. Br. at 54-58. The pertinent part reads: "[L]adies and gentlemen, when your work begins, I submit that your verdict should, as the word means, speak – [Deronceler interjects: "Innocent"] – the truth. Speak it for [four named victims]. And all of the witnesses whose testimony you have heard, return verdicts of guilty as charged."

This court reviews a claim of prosecutorial misconduct *de novo*. *United States v. Eckhardt*, 466 F.3d 938, 947 (11th Cir. 2006). "[T]he defendant must show a reasonable probability that, but for the prosecutor's statements, the result of the proceeding would have been different." *Davis v. Zant,* 36 F.3d 1538, 1545 (11th Cir. 1994). The court considers four factors:

> 1) the degree to which the challenged remarks have a tendency to mislead the jury and to prejudice the accused; 2) whether they are isolated or

26

extensive; 3) whether they were deliberately or accidentally placed before the jury; and 4) the strength of the competent proof to establish the guilt of the accused.

*Id.* at 1546.

Applying these four factors, the closing argument does not constitute prosecutorial misconduct. Starting with factor one, telling the jury that the word "verdict" means "to speak the truth," and then asking the jury to "speak the truth" for the alleged victims of the conspiracy, hardly misled the jury or prejudiced the outcome in this particular case. As one of our sister circuits has held, using the phrase "to speak the truth" and thereby "asking the jury to deliver an honest verdict is proper." *United States v. Jones*, 674 F.3d 88, 93 (1st Cir. 2012). Under the second factor, Deronceler complains about a single isolated event, not a pattern of conduct. The comment was deliberately placed before the jury (factor 3), but the strength of the evidence against Deronceler is strong (factor 4). Therefore we conclude there was no misconduct during the prosecutor's closing remarks.

### D.    Deronceler's Sentence

Deronceler challenges four aspects of his sentencing. "[T]he district court's interpretation of the sentencing guidelines is subject to *de novo* review on appeal, while its factual findings must be accepted unless clearly erroneous." *United States v. Ellis*, 419 F.3d 1189, 1192 (11th Cir. 2005) (internal quotations and citations

27

omitted).  As explained above concerning Pharr's challenge, however, the reasonableness of a sentence is reviewed for an abuse of discretion.  *Gall*, 552 U.S. at 51.

### 1. Criminal history category

Deronceler argues the district court clearly erred by incorrectly transcribing his criminal history level as category IV, not category III, resulting in a longer sentence.  As he notes, his initial PSR reflected five criminal history points, which under the Sentencing Guidelines establish a criminal history category of III.  U.S.S.G. ch. 5, pt. A.  He fails to mention, however, that his PSR was amended before sentencing to include a direct criminal contempt of court offense worth two points, thereby increasing his score to seven criminal history points and a corresponding criminal history category of IV.  Therefore, the court did not err, let alone clearly err, by assigning him a criminal history category of IV.

### 2. Minor role reduction

Deronceler also appeals the district court's denial of his request for a reduction under the Guidelines for being "a minor participant in any criminal activity."  U.S.S.G. § 3B1.2(b).  The comments to the U.S. Sentencing Guidelines explain this classification is available to defendants who are "less culpable than most other participants, but whose role could not be described as minimal."

U.S.S.G. § 3B1.2(b), cmt. 5.  The Guidelines prescribe a two-level decrease in the defendant's adjusted offense level if he was a minor participant.  U.S.S.G. § 3B1.2.

This court has identified two salient principles.  First, "the district court must measure the defendant's role against the relevant conduct for which she was held accountable at sentencing," which "in many cases ... will be dispositive." *United States v. DeVaron*, 175 F.3d 930, 945 (11th Cir. 1999) (en banc).  Second, if the first principle is not dispositive, then "the district court may also measure the defendant's role against the other participants, to the extent that they are discernable, in that relevant conduct." *Id.*  The district court's determination whether the defendant qualifies for a minor role reduction is a finding of fact we review for clear error. *Id.* at 937.

In denying his request, the district court noted Deronceler had described himself to Habib as the "boss" of the conspiracy, had met Habib to "straighten things out," and had cashed fraudulent checks for several years.  The district court did not compare Deronceler's culpability to that of other conspirators.

Deronceler challenges two aspects of the district court's decision.  First, Deronceler argues he is less responsible than other conspirators, so the district court erred by denying his request.  Br. at 47-48.  As explained above, *DeVaron* does not require the district court to consider the defendant's responsibility relative to other conspirators, so it did not err by declining to do so.  Second, Deronceler

29

argues the district court erred in its assessment of the first principle, evaluating his role in absolute terms. Deronceler argues "he was not an organizer or manager," "his actual benefit ... was minimal at best," and "there is no evidence that he ... even knew the extent of the conspiracy." Br. at 45. He argues that these principles apply equally under the Guidelines in effect at the time of sentencing and those in effect today, which include an expanded note suggesting five factors that Deronceler tracks.

The evidence upon which the district court based its decision is enough to support the district court's finding that Deronceler played more than a minor role in the operation. Therefore the district court did not err in denying Deronceler's motion for a minor role reduction.

### 3.    Deronceler's motion for a downward departure

Deronceler also appeals the denial of his motion for a downward departure in his sentence. He advanced three separate reasons for receiving a downward departure: a mental illness, a significantly diminished mental capacity, and a criminal history category that over-represents the seriousness of his prior crimes.

The denial of a downward departure request is not reviewable unless the district court "erroneous[ly] belie[ved] it lacked the authority to grant one." *United States v. Ortega*, 358 F.3d 1278, 1279 (11th Cir. 2003). There is no indication the

district court believed it lacked the authority to grant a downward departure, so the district court's decision is not reviewable.

### 4.    Deronceler's motion for a sentence variance

Finally, Deronceler appeals the denial of his request for a sentence variance, citing the same reasons he provided when seeking a downward departure. He argues his diminished mental capacity is demonstrated by his previous belief that "he could represent himself at the trial." Br. at 51; *see id.* at 54. He also renews the argument that a transcription error in his PSR resulted in his criminal history being over-represented. Br. at 51.

Reviewing this request "under a deferential abuse-of-discretion standard," *United States v. Livesay*, 525 F.3d 1081, 1090 (11th Cir. 2008), we see no cause for reversal here: Deronceler was found competent to stand trial and the district judge later concluded he "ha[s] no reason to believe [the] finding [of] competency is not correct." Br. at 50. Nor do we find any abuse of discretion in the district court's decision to credit the revised PSR and account for an additional conviction worth two criminal history points. Because Deronceler's 183-month sentence does not appear to "lie[] outside the range of reasonable sentences dictated by the facts of the case," *United States v. Clay*, 483 F.3d 739, 743 (11th Cir. 2007), we conclude that the denial of his motion for a variance did not make his sentence substantively unreasonable.

31

## V.    CONCLUSION

In summary, we affirm all the appellants' convictions but vacate Pharr's sentence and remand her case to the district court for resentencing.  Consistent with our judgment in *United States v. Presendieu*, the district court may not consider victims or financial losses attributable to co-conspirators, such as Jean, that are not also causally connected to Pharr.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**